THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY LOVINGER, Defendant-Appellant.

Second District   No. 83—330

Opinion filed January 17, 1985.

Robert P. Will, Jr., of Waukegan, and Mary Robinson, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Marlene V. Newton, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

This is an interlocutory appeal by the defendant, Jeffrey Lovinger, under Supreme Court Rule 604(f) (94 Ill. 2d R. 604(f)), from an order of the circuit court of Lake County, denying his motion to dismiss the charges against him based on former jeopardy.

The defendant was originally charged by information with the following three illegal drug deliveries: (1) October 15, 1979, delivery of less than 30 grams of a substance containing cocaine (Class 2 felony) (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(b)); (2) October 16, 1979, delivery of 30 grams or more of a substance containing cocaine (Class X felony) (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(a)(2)); and (3) October 16, 1979, delivery of more than 2.5 but not more than 10 grams of a substance containing cannabis (Class A misdemeanor) (Ill. Rev. Stat.

1979, ch. 56½, par. 705(b)). The case proceeded to a bench trial, and the trial judge declared a mistrial on his own motion during the State's case in chief. The case was then assigned to another judge, who denied the defendant's motion to dismiss based on former jeopardy. A detailed statement of the proceedings at trial is essential to an exploration of the issue of double jeopardy.

The defendant, Jeffrey Lovinger, was arrested on October 16, 1979, and was subsequently charged by information with delivering cocaine to an undercover police officer named Paula Riccio on October 15, 1979, and delivering cocaine and cannabis to Riccio on the following day.

On September 7, 1982, prior to trial, an order was entered on the defendant's motion, requiring that "the evidence" in the case be transported to a laboratory in Glen Ellyn, and that "a portion of said evidence be analyzed [by the defendant's expert] in the presence of a chemist from the Northern Illinois Police Crime Laboratory." As explained hereinafter, it became apparent at trial that this order was not complied with.

The matter proceeded to a bench trial on November 3, 1982. On that date the defendant filed his response to the court's earlier order for discovery, indicating his intention to raise the defense of entrapment.

Paula Lemke, formerly Riccio, the undercover police officer named in the information, testified for the State about the deliveries on October 15 and 16, and about her part of the chain of custody regarding the alleged controlled substances. According to Lemke, the delivery on October 15 was made in Lovinger's car which was parked in the parking lot of Goodman's Restaurant in Highland Park. She and Lovinger had just lunched together in the restaurant. They had previously arranged to meet at Goodman's in order to consummate the drug transaction. The delivery on October 16 took place in Lovinger's apartment in Waukegan. Arrangements for this transaction were made during the earlier delivery at Goodman's and in subsequent telephone conversations. Immediately after the transaction on October 16, Lovinger was arrested along with a codefendant not involved in this appeal, Stanley Blackowicz. The purported cocaine delivered on October 15 was contained in a plastic bag identified by Lemke as part of People's exhibit No. 1. The purported cocaine delivered on October 16 was contained in three plastic bags which she identified as People's exhibits Nos. 2A, 2B and 2C. The alleged marijuana delivered on October 16 was contained in a plastic bag which was part of People's exhibit No. 3.

During cross-examination of Lemke, it became apparent that the court's order of September 7, 1982, regarding analysis of the evidence by the defendant's expert, had not been carried out. The expert would not analyze the evidence in the presence of a chemist from the crime lab, apparently because he wanted to dry the substances overnight to determine their weight accurately. Subsequently, without any modification of the prior court order regarding analysis of the evidence by the defendant's expert, samples from the exhibits were taken to the defendant's expert and tested. Lemke testified, however, concerning the purported cocaine delivered on October 16, that the sample was taken from only one of the three plastic bags. On motion of the defendant the bench trial was continued so that the defendant's expert could analyze the substance in the other two plastic bags.

The bench trial resumed on Monday, January 31, 1983, and continued all that week and the first two days of the next. Lemke's cross-examination included questions about two other deliveries of purported cocaine by Lovinger to her on October 5 and 10, 1979. Presumably, these transactions were brought up by the defense with a view toward the anticipated entrapment defense. The purported cocaine delivered on October 5 and 10 was identified by Lemke as part of People's exhibit Nos. 4 and 5, respectively.

Other police officers testified about surveillance they conducted at the scenes of the transactions, the arrest of Lovinger and Blackowicz after the transaction on October 16, during which Blackowicz was observed trying to flush down the toilet the money Lemke paid for the substances, and the chain of custody concerning the exhibits. The State's chemist testified about his analysis of the evidence, and his findings supported the charges against the defendant. Most of the eight days of trial were spent on chain of custody.

During the direct examination of Officer Hutchings, evidence officer for the Waukegan police department, a discrepancy developed regarding the chain of custody of People's exhibit No. 1, the substance allegedly delivered on October 15. The court called a recess so that the prosecutor could "get [his] act together."

Following the recess, defense counsel informed the court that during the recess the prosecutor and the witness had been passing papers back and forth between them and had appeared to be discussing the case. Defense counsel stated that the prosecutor did not have a right to discuss the witness' testimony with him during a recess taken during said testimony. Defense counsel suggested that "the remaining testimony by this witness will have been tainted by the discussion."

The prosecutor told the court that he did not tell Hutchings how

to testify. In fact, he advised, he told Hutchings they could not discuss his testimony. The prosecutor simply asked for Hutchings' records, reviewed them, and asked Hutchings to review his records and to testify from memory.

The judge then stated that it was improper for the prosecutor to talk with his witness during the recess, but that any error was harmless because Hutchings had been referring to his records throughout his testimony. The judge concluded his remarks by saying, "[T]here will be no further conversation, and if there is a motion for mistrial, that motion is denied." Defense counsel then moved to have Hutchings' testimony stricken, and to bar Hutchings from testifying further. When these motions were denied, defense counsel moved for a mistrial, which motion was also denied, and Hutchings' testimony continued. Prior to an overnight recess during his direct examination, the court admonished Hutchings not to discuss his testimony with any lawyers or anyone else because "we don't want any mistrial to occur."

Part of Hutchings' cross-examination concerned the method by which evidence was generally processed at the Waukegan police department. Hutchings testified as follows: There are evidence lockers located outside the booking room. Each locker has two keys, one kept in Hutchings' office, and the other kept in the locks of the lockers. When an officer seizes evidence, he places it in one of the lockers which he then locks. The officer then places the key through a slot into another locker which is kept locked. Hutchings keeps both keys for that locker. When Hutchings gets to work in the morning, he opens the locker with the keys, and then uses those keys to retrieve the evidence out of the other lockers. He then takes the evidence to his office. On redirect examination Hutchings stated, among other things, that it is possible for an officer to keep the key once he has placed evidence in a locker. Under those circumstances, Hutchings does not take the evidence out of that locker and into his office.

The State's next witness was Officer Bowden, who testified about the surveillance he conducted on the transactions on October 15 and 16, and about his part of the chain of custody of the physical evidence. During his direct examination he testified that he had handled the substances delivered on October 5, 10, 15, and 16, and in each case he received the evidence from Lemke and locked it in one of the evidence lockers described by Hutchings. Bowden, however, kept the key. He did not place it in the locker with the slot for keys described by Hutchings. In each case Bowden subsequently retrieved the evidence from the locker himself and gave it to the next person in the

chain of custody. Regarding the purported cocaine delivered on October 10, Bowden testified that he received it from Lemke and locked it in an evidence locker on October 10. On *the following day* he retrieved it and turned it over to Hutchings. (Hutchings had previously testified that Bowden gave that evidence to him on October 10.) The prosecutor then asked Bowden, "When did you turn it over to Officer Hutchings?" and Bowden replied that he thought it was the following day, but he would have to see his records to be sure. When the prosecutor asked him if there was anything that would refresh his recollection, defense counsel objected. The court told the prosecutor not to correct the witness and called a recess, stating "You [presumably Officer Bowden] don't talk with them [presumably the lawyers]. They don't talk with you about this case. Again, I'm going to advise, let's get everything in order."

Following the recess, defense counsel stated to the judge, "[O]nce again I am informed that [the prosecutor] has been talking to a witness." The judge asked the prosecutor if he had talked to Bowden, and the prosecutor first replied, "Not about this case, no." He subsequently told the judge that "[t]he only thing I said to him was, 'Do you have any police report on the 5th or 10th.'" During the recess, defense counsel had asked the prosecutor for the police reports concerning those dates. The prosecutor told the judge that he did not talk to Bowden about his testimony.

When Bowden entered the courtroom, the judge asked him if the prosecutor had talked with him during the recess. Bowden first told the court that he had not, and then said, "I told him that I wasn't pleased with the fact I was getting my butt chewed out. But that was it."

The defendant then testified to a third version of the conversation. He said that during the recess he overheard the prosecutor ask Bowden if he wrote any police reports concerning the 5th and 10th of October. Bowden replied that he was not sure whether he did or not. Lovinger subsequently heard something about the key to the evidence locker. Defense counsel had stated earlier that Lovinger told him that the prosecutor asked Bowden why he did not "follow the procedure with respect to that key," and that Bowden replied that he was "not supposed to use that key."

The court then asked the prosecutor to let him see the police reports from October 5 and 10, and the prosecutor replied that he did not have them. The court then ordered him to get the reports and called a recess.

Following the recess, the judge declared a mistrial on his own mo-

tion, stating:

"Gentlemen, at this time I want to put something on the record. I have not been satisfied with the way this case has been presented. First, I call to the attention of everybody in this courtroom that because of the laxity of the prior State's Attorney and his administration, there was nothing done to resolve this cause of action before a jury or bench trial because of the fact that this matter had occurred in 1979.

Secondly, I am concerned about the lack of discovery afforded the defense, pursuant to court order of Judge Doran, and even of this court.

Third, there was a failure to fully comply with the orders of the Court during trial regarding discovery. For example, I point out to my order of September 7th and the fact that a witness in this cause did remove portions from Group Exhibit No. 2, for identification, when I had ordered all of the exhibits to be taken to the defense chemist for purpose of analysis, pursuant to the order of discovery.

Fourth, I am very much concerned about what occurred early this afternoon in this courtroom. And this can be classified as either direct or indirect contempt, and I'm not going into that phase of it. Because of the talking about a pending matter with a witness who says he did not talk with the Assistant State's Attorney, and the Assistant State's Attorney saying to me that he did not talk with the witness, except for request by Bob Will, representing the Defendant, and then you changing your conversation after Lovinger under oath indicated certain things. And then you said something else contrary, and it's all on the record.

At this point in the trial, it is questionable, and I doubt whether discovery has been completed by the State to the defense.

And further it has been disclosed by the witness on the stand, when he said, 'I told him I was not pleased with the fact I was getting my butt chewed out, but that was it.'

I, as the Court, am wholly unaware of any—I'm sorry. I am only aware of a reprimand by anyone except my admonition to the witness, to the defense and to the Assistant State's Attorney, not to discuss this case with anyone. And prior to I continuing this matter this morning, I said, 'I am going to continue this case to 1:30. You don't talk with them; they don't talk with you about this case. Again, I'm going to advise, let's get every-

thing in order.'

    I feel error has crept into this trial and it can only be resolved by me declaring a mistrial, which I so order, and I recuse myself from this case, and I order you to appoint another judge. Call the Clerk. And the only other judge that will not take this is Strouse, because he had recused himself before. And after it is assigned to another judge, I instruct you to go to the other judge and let him set it for trial. Bond is continued."

This statement of the judge concluded the hearing on that date.

    The defendant subsequently filed a motion to dismiss based on former jeopardy. During argument on the motion defense counsel stated that he had received the police reports relating to October 5 and 10 prior to the mistrial declaration. When the judge declared the mistrial, as he made his final comments, he was "getting up and walking out the door, and that's the end of the proceedings, and that's how it terminated."

    The judge to whom the matter was reassigned denied the defendant's motion to dismiss, found that there was a "manifest necessity" for the mistrial declaration, explaining, "The overriding thing of the trial judge, it appears to this court, is the fact of concern of error creeping into the record. This is repeated. An error, of course, would destroy a fair trial."

    In his motion to dismiss because of former jeopardy, the defendant relied on the double jeopardy clause of the Federal Constitution, article I, section 10 of the Illinois Constitution, and section 3—4(a)(3) of the Criminal Code of 1961.

    The Federal constitutional provision provides, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." (U.S. Const., amend. V.) This provision is applicable to criminal proceedings in State courts. *Benton v. Maryland* (1969), 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056.

    Article I, section 10 of the Illinois Constitution provides, in pertinent part, "No person shall *** be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, sec. 10.

    Section 3—4(a)(3) of the Criminal Code of 1961 provides, in pertinent part:

        "A prosecution is barred if the defendant was formerly prosecuted for the same offense, based upon the same facts, if such former prosecution:

                    * * *

        (3) Was terminated improperly ***, in a trial before a

court without a jury, after the first witness was sworn but before findings were rendered by the trier of facts ***." Ill. Rev. Stat. 1983, ch. 38, par. 3—4(a)(3).

On appeal the defendant bases his argument on the principles of double jeopardy as set forth in case law without making any distinctions between the provisions set forth above, presumably because there are none of any legal significance for purposes of this case.

The constitutional protection against double jeopardy includes the defendant's "valued right to have his trial completed by a particular tribunal ***." (*Wade v. Hunter* (1949), 336 U.S. 684, 689, 93 L. Ed. 974, 978, 69 S. Ct. 834, 837.) This right, however, is not absolute and "must in some instances be subordinated to the public's interest in fair trials designed to end unjust judgments." (*Wade v. Hunter* (1949), 336 U.S. 684, 689, 93 L. Ed. 974, 978, 69 S. Ct. 834, 837.) The standard for determining whether a defendant may be retried following declaration of a mistrial over his objection is whether there was a "manifest necessity" for the mistrial declaration. (*Arizona v. Washington* (1978), 434 U.S. 497, 54 L. Ed. 2d 717, 98 S. Ct. 824.) This standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." (*Illinois v. Somerville* (1973), 410 U.S. 458, 462, 35 L. Ed. 2d 425, 429, 93 S. Ct. 1066, 1069.) As a general matter, however, a trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. (*Illinois v. Somerville* (1973), 410 U.S. 458, 464, 35 L. Ed. 2d 425, 431, 93 S. Ct. 1066, 1070.) If the problem giving rise to the mistrial declaration could have been adequately corrected short of aborting the proceeding, however, the standard of "manifest necessity" has not been met, and retrial is barred. *People v. Phillips* (1975), 29 Ill. App. 3d 529, 331 N.E.2d 163.

Where a defendant asks for or consents to the declaration of a mistrial, different principles come into play. (*Oregon v. Kennedy* (1982), 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083; *People ex rel. Mosley v. Carey* (1979), 74 Ill. 2d 527, 387 N.E.2d 325, *cert. denied* (1979), 444 U.S. 940, 62 L. Ed. 2d 306, 100 S. Ct. 292.) Under such circumstances, retrial is barred only if the conduct giving rise to the mistrial declaration was intended to provoke a mistrial. *Oregon v. Kennedy* (1982), 456 U.S. 667, 679, 72 L. Ed. 2d 416, 427, 102 S. Ct. 2083, 2091.

The defendant in the instant case argues that he did not consent

to the mistrial and that there was no manifest necessity for the mistrial declaration, because the concerns cited by the trial judge when he declared the mistrial either had been or could have been adequately corrected with less drastic means.

The State, however, referring to the motion for mistrial made by the defendant during Hutchings' testimony (which motion was denied), and the defendant's failure to object when the judge declared the mistrial, maintains that the defendant consented to the mistrial declaration. The State also argues that the conduct of the prosecutor which caused the mistrial declaration was not intended to provoke a mistrial. Alternatively, the State contends that if the defendant did not consent to a mistrial, it was justified under the manifest-necessity standard.

In reply, the defendant maintains that silence in the face of a *sua sponte* declaration of mistrial by the court does not constitute consent. He maintains that he had no real opportunity to object because the judge "physically left the bench as he uttered those orders." Alternatively, he maintains that, if he did consent, retrial should be barred anyway because the prosecutor's conduct, in speaking to the witness Bowden during the recess, was intended to provoke a mistrial so that the State would have another opportunity to try the case.

The parties have not cited, nor do we find, any Illinois cases on the question of whether a defendant's mere silence or failure to object amounts to consent to a mistrial declared on the court's motion, such that retrial is not barred absent prosecutorial or judicial conduct intended to provoke the mistrial. (See *People v. Bean* (1975), 26 Ill. App. 3d 1090, 325 N.E.2d 679, *aff'd on other grounds* (1976), 64 Ill. 2d 123, 355 N.E.2d 17.) There appears to be a split of authority on this question in other jurisdictions. (Annot., 63 A.L.R.2d 782 (1959).) Failure to object would not amount to consent where there is no opportunity to interpose an objection. See *United States v. Jorn* (1971), 400 U.S. 470, 487, 27 L. Ed. 2d 543, 557-80, 91 S. Ct. 547, 558.

In this case, however, there was more than silence on the part of the defendant. He had previously requested a mistrial when the prosecutor spoke to one of his witnesses, Officer Hutchings, about chain of custody during a recess taken during Hutchings' testimony. At that time defense counsel maintained that "the remaining testimony by this witness will have been tainted by the discussion." Although that motion was denied, it was again defense counsel who, following a recess taken during Officer Bowden's testimony, brought to the court's attention that "once again *** [the prosecutor] has been talking to a witness [about chain of custody]." This discussion during the recess

was one of the principal reasons for the court's *sua sponte* declaration of a mistrial. Under such circumstances, there are cases, not cited by the parties, that suggest that failure to object does amount to consent.

The case most similar to that before us is *People v. Montlake* (1918), 184 App. Div. 578, 172 N.Y.S. 102. There the defendants were charged with grand larceny in the first degree. A first trial ended in a mistrial because the prosecutor referred to defense counsel as the attorney for the "pickpocket trust" and a pickpocket himself. On the first occasion of such remarks, the defendants moved for a mistrial, which motion was denied, and the defendants excepted. On the second occasion they protested the remarks but did not move for a mistrial. On the third and final occasion, which was more flagrant than the others, the court declared a mistrial on its own motion without objection by the defense. The reviewing court concluded that the mistrial was declared with the defendant's consent, stating:

> "I think that [the court's] such action may well be regarded as a somewhat belated granting of defendants' said former motion for that relief. Defendants' exception to the denial of that motion still stood upon the record, and I think that defendants' counsel should then in clear terms have withdrawn that motion if he did not wish it granted." 184 App. Div. 578, 582, 172 N.Y.S. 102, 105.

More recently in *State v. Wolak* (1960), 33 N.J. 399, 165 A.2d 174, *cert. denied* (1961), 365 U.S. 822, 5 L. Ed. 2d 701, 81 S. Ct. 710, the defendant was charged with first degree murder. His first trial resulted in a conviction which was reversed on appeal. During his retrial, the prosecutor asked two witnesses to take the gun used in the killing, and to point it at him as the defendant had allegedly pointed it at the victim. The prosecutor then called the widow of the victim and directed her to hold the gun, stand up like the defendant had, and point it at anyone in the courtroom as if he were her husband to show the aim. The witness pointed the gun at the defendant. The prosecutor then asked her to whom she was pointing the gun, and she replied, "Wolack [defendant] that --." (33 N.J. 399, 400, 165 A.2d 174, 175.) The defendant thereupon made a motion for mistrial, which was denied. The court instructed the jury to disregard the entire incident.

Three days later the court, outside the presence of the jury, informed counsel that it had decided to reconsider the defendant's motion for mistrial. Concluding that the demonstration by the victim's widow was prejudicial and would remain so regardless of his instructions to the jury, the judge ruled that he "must grant the motion

made on behalf of the defendant for a mistrial." (33 N.J. 399, 401, 165 A.2d 174, 175.) No objection was made by the defendant.

On appeal the defendant claimed that another retrial violated the double jeopardy provision of the New Jersey Constitution. The reviewing court disagreed, concluding that the defendant waived his right to go to verdict, stating:

> "The right of the trial court to reconsider and redetermine motions made during trial cannot be disputed. As in the instant case, the trial court did exactly that in [*Montlake*] \*\*\*." 33 N.J. 399, 402, 165 A.2d 174, 175.

Two similar cases are *People v. Bowman* (1971), 36 Mich. App. 502, 194 N.W.2d 36, and *Kamen v. Gray* (1950), 169 Kan. 664, 220 P.2d 160, *cert. denied* (1950), 340 U.S. 890, 95 L. Ed. 645, 71 S. Ct. 206. See also *People ex rel. Roberts v. Orenic* (1981), 88 Ill. 2d 502, 431 N.E.2d 353 (defendant consented to mistrial where it was granted on his motion, even though, after it was declared, defense counsel stated he thought the mistrial should really be on the court's motion because the defense was not the cause of the mistrial); and *Sedgwick v. Superior Court for District of Columbia* (D.C. Cir. 1978), 584 F.2d 1044, *cert. denied* (1979), 439 U.S. 1075, 59 L. Ed. 2d 42, 99 S. Ct. 849 (defendant held to have consented to mistrial declared on court's own motion without objection where the defendant moved to dismiss the charge against him because of an alleged violation of his right to pretrial discovery, arguing that his right to a fair trial was seriously undermined by the discovery problem).

The court in *Bowman* included the following words of caution about imputing a mistrial declared by the court to a prior motion by the defendant for mistrial where such motion had been denied:

> "We acknowledge the merit in the defendant's fear that by holding that a denial [of the prior motion] has no effect, any motion made by a defendant might be granted to his detriment at some later stage of the proceedings when his fortunes have changed. This, if allowed, would certainly dampen the efforts of the defendant's counsel to protect his client, making him fearful that any motion for a mistrial, though denied, may return to haunt him when the court decides to reverse its decision (perhaps because a prosecutor's case has not gone as well as it might have), and force the defendant into a second trial on a theory that the court was only finally doing what the defendant asked him to do." (36 Mich. App. 502, 509, 194 N.W.2d 36, 40.)

The court in *Bowman* went on to conclude that such a situation was not presented in that case.

In the instant case, while the question may be a close one, this court holds that the defendant consented to the mistrial. The prior motion for mistrial was made by the defendant because the prosecutor talked to one of his witnesses, Officer Hutchings, about chain of custody during a recess taken during Hutchings' testimony. Defense counsel stated at that time his feeling that "the remaining testimony by this witness will have been tainted by the discussion." Moreover, the mistrial was declared by the court when defense counsel again brought to the court's attention another such discussion about chain of custody, this time between the prosecutor and Officer Bowden during a recess taken during the latter's testimony. Under these circumstances, and in light of the authorities cited above, it was incumbent upon defense counsel to object to the court's mistrial declaration, if, in fact, the defendant wanted to go to judgment. While the defendant argues that there was no real opportunity to do so, counsel could well have asked for leave to state his objection during the course of the mistrial declaration. Had he done so, the mistrial declaration could have been rescinded, as was done in *People v. Estrada* (1980), 91 Ill. App. 3d 228, 414 N.E.2d 512.

Additionally, because this was a bench trial, the defendant might readily, at a later date, have filed a motion asking the court to reconsider its mistrial declaration. Had the motion been granted, the trial could have been resumed.

It is apparent that counsel initially spoke to Bowden in an effort to satisfy defendant's request for police reports of the October 5 and 10 transactions. Although, if Lovinger's testimony is to be believed, the prosecutor exceeded the scope of what would clearly be a proper inquiry by asking Bowden why he did not follow the procedure described by Hutchings regarding the key to the evidence locker, it is difficult to conceive how it could be thought that such a question, if improper, would prevent a fair trial and a just verdict so that a mistrial would have to be declared. The record does not support a conclusion that the prosecutor was trying to provoke a mistrial because his case had been going badly. Compare *People v. Pendleton* (1979), 75 Ill. App. 3d 580, 394 N.E.2d 496.

In view of the foregoing, we do not reach the issue of "manifest necessity." The order of the circuit court of Lake County is therefore affirmed, and the cause is remanded for a new trial.

Affirmed and remanded.

HOPF and REINHARD, JJ., concur.