2021 IL App (2d) 190476
No. 2-19-0476
Opinion filed March 30, 2021
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CM-1955 |
| PATRICIA LYNN KOSOBUCKI, | ) ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Jorgensen and Brennan concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Patricia Lynn Kosobucki, appeals the denial of her motion to dismiss this prosecution, on double-jeopardy grounds. We reverse.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was charged by amended complaint with two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (2) (West 2018)) and one count of criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2018)), arising out of an altercation with her ex-husband, Alberto Montano. The State alleged that defendant struck Montano in the face with her hand and smashed his cell phone with a hammer.

¶ 4    Defendant filed a motion for pretrial discovery in which she requested the State to disclose, *inter alia*, any written statements made by the defendant and any information favorable to the defendant. It is undisputed that, prior to trial, the State did not turn over written statements that defendant and Montano gave to the police.

¶ 5    On April 16, 2019, defendant's jury trial commenced.

¶ 6            A. Officer Rodriguez's Absence and the Stipulation to His Testimony

¶ 7    Aurora police officer Pedro Rodriguez was one of the officers who investigated Montano's complaint of domestic battery on July 25, 2018. In the prosecutor's opening statement, she informed the jury that Rodriguez would corroborate Montano's version of the events. However, after opening statements, but before any witnesses testified, the State informed the court that Rodriguez was not available, because he had undergone surgery and was hospitalized. The State indicated its readiness to proceed without Rodriguez's testimony.

¶ 8    Defense counsel represented that he had Rodriguez under subpoena and could not proceed without him because only Rodriguez could testify to defendant's demeanor the morning of the incident. According to defense counsel, Rodriguez would also testify that he did not see a hammer that defendant allegedly used to smash Montano's cell phone. Defense counsel requested a continuance until Rodriguez could appear at trial. Counsel also asked for a recess for his investigator to locate another officer, who did not appear pursuant to defense counsel's subpoena. The court denied both requests.[1]

---

[1] Later in the trial, the court granted defendant an overnight recess to obtain Rodriguez's presence, but the defense found out that Rodriguez would not be available for two weeks because of his surgery.

¶ 9    Due to Rodriguez's absence, defense counsel moved for a mistrial twice, once during the State's case-in-chief and again after the court denied defendant's motion for a directed verdict. The court denied both motions. The next day, (the second day of trial) during defendant's case-in-chief, the parties stipulated to Rodriguez's testimony in front of the jury.

¶ 10               B. The State's Discovery Violation and the Mistrial

¶ 11    The State presented its case-in-chief on the first day of trial. Montano testified that, although he and defendant were divorced, they were reconciling and living together off and on when this incident happened. Early in the morning of July 25, 2018, defendant woke Montano. She had discovered a compromising video of Montano and another woman on his phone. An argument ensued. According to Montano, while the parties were in the kitchen, defendant struck him in the face with her fist and smashed his phone with a hammer. Montano testified that defendant broke a window while she was swinging the hammer. On cross-examination, Montano testified that he made a written statement when he reported the incident to the police later that morning.

¶ 12    Aurora police officer Clark Johnson testified next. Along with Rodriguez, Johnson responded to defendant's home the morning of July 25, 2018. According to Johnson, defendant told him (Johnson) that she punched Montano in the face with her right hand. Johnson testified that he observed fresh blood and a scrape on her hand. Johnson testified that he did not include defendant's statement to him in his report, because Rodriguez was the lead investigator, who was responsible for writing the report.

¶ 13    On cross-examination, defense counsel asked Johnson whether defendant stated that she struck Montano in self-defense. The court sustained the State's hearsay objection. At a sidebar conference, the court asked defense counsel if he had a police report indicating that defendant told

Johnson that she acted in self-defense. Defense counsel produced Rodriguez's report, in which Rodriguez memorialized defendant's statement that she punched Montano because he would not "get out of her face." The court ruled that counsel could not cross-examine Johnson using Rodriguez's report. Defense counsel then argued that he needed Rodriguez to testify. The court again ruled that Johnson's testimony as to defendant's allegedly exculpatory statement at the scene would be inadmissible hearsay. Counsel made the first motion for a mistrial, which the court denied.

¶ 14 In front of the jury, defense counsel asked Johnson whether Montano made a written statement. Johnson did not think so, because he did not see one in the police report.

¶ 15 Next, Officer Patricia Vega testified that Montano presented himself at the police station on the morning of July 25, 2018. According to Vega, Montano was bleeding from his nose and mouth, but he did not want to sign a complaint against defendant. On cross-examination, Vega testified that Montano did not tell her about a broken window. When defense counsel asked whether Montano made a written statement, Vega initially said that he did. Then, confusingly, she stated that Montano could have refused to fill one out, "but he signed it, or filled it out." She added: "I don't have the initial report." Ultimately, she backtracked and testified that, "as far as I saw," no written statement existed. At the conclusion of Vega's testimony, the State rested.

¶ 16 After the court denied defendant's motion for a directed verdict, and the parties were unable to work out a stipulation concerning Rodriguez's testimony, the defense again moved for a mistrial, arguing that it was unfair for the State to elicit that defendant admitted striking Montano without allowing defendant to introduce her statement to Rodriguez that she did so because Montano would not get out of her face. Defendant argued that Rodriguez was a necessary witness for the defense.

¶ 17    Following the court's denial of the second motion for a mistrial, the defense started its case-in-chief. Matthew Corona, defendant's 17-year-old son from another relationship, testified that he was in his bedroom with his girlfriend on the morning of July 25, 2018, when he heard "people yelling." According to Matthew, he grabbed his younger brother, Noah, from where he was sleeping on the couch and put Noah in his (Matthew's) room. Then, Matthew saw defendant and Montano arguing in the kitchen. Matthew testified that he stopped the argument from escalating by taking defendant to his room. Matthew testified that he did not hear glass breaking, nor did he see defendant strike Montano or break Montano's phone.

¶ 18    Defendant's next witness was her 10-year-old son with Montano, Noah. On the morning of July 25, 2018, Noah was sleeping on the living room couch when he was awakened by "yelling and screaming." His parents were arguing. He heard glass breaking, but he did not witness anything, as his brother pulled him into the bedroom to keep him away from the argument. On cross-examination, Noah reaffirmed that he heard what was going on but did not see anything.

¶ 19    Next, out of the hearing of the jury, the parties discussed with the court a possible stipulation concerning Rodriguez's testimony, but that issue did get not resolved. Instead, the court proceeded to the instructions conference.

¶ 20    The next morning, April 17, 2019, the court and the parties finished the instructions conference. Then, the court ruled on a motion *in limine* that the State had filed that morning. In front of the jury, defendant recalled Johnson as a witness to lay the foundation for certain crime-scene photos that defendant then introduced into evidence.

¶ 21    Next, the parties informed the court that they had reached a stipulation concerning Rodriguez's testimony, which defense counsel read to the jury. In pertinent part, the parties stipulated that Rodriguez would testify that he observed a broken kitchen window at defendant's

residence the morning of her altercation with Montano; that he did not note in his report that he observed a hammer at the scene; and that defendant told Rodriguez: "[Montano] would not get out of her face so she did punch [Montano] in the face with her right hand."

¶ 22    Defendant, as the last witness for the defense, testified in her own behalf. She testified that at approximately 1:30 a.m. on July 25, 2018, she found explicit sexual images of multiple women on Montano's phone. She woke Montano. According to defendant, they sat in the kitchen for a while, talking.

¶ 23    The prosecutor then interrupted defendant's testimony. At a sidebar conference outside the jury's presence, the prosecutor said: "Our Officer Vega came up to us before the trial started and said that they have evidence of written statements by both the [d]efendant and the victim that were never turned over because of an indexing problem with records." The prosecutor next said: "At this time we are going to agree to a mistrial." The court said: "Okay. Thank you." Defense counsel immediately interjected at the sidebar: "Judge, can I be heard on that?" The court stated: "Not at this time." The prosecution did not produce the written statements, nor did the court ask for them. The prosecution did not divulge the contents of the written statements, nor did the court ask.

¶ 24    Without further consulting the parties, the court told the jury that "there have been some issues with evidence on this case." Next, the court told the jury: "I'm going to declare a mistrial at this time." The court's written order declaring the mistrial stated: "The People's request for a mistrial is granted due to newly obtained evidence."

¶ 25    After discharging the jury, the court discussed setting a new trial date. Defense counsel requested a date when Rodriguez would be present. He then said: "I would like to preserve my objection, for the record, that I was not allowed to argue about the mistrial." The court stated: "Well, argue it now. You have one minute. Argue." Defense counsel stated that a mistrial was not

appropriate. "We were down to our last witness," he said. "There were statements. I haven't even had a chance to review them." Counsel noted that the State's "motion" for a mistrial was "granted without any argument."

¶ 26                                C. Defendant's Motion to Dismiss

¶ 27    On May 7, 2019, defendant moved to dismiss the charges on double-jeopardy grounds. Defendant alleged that her pretrial motion for discovery included a request for written statements. She also alleged that the police report indicated that written statements were given. However, she alleged, when her counsel asked the State, on multiple occasions, to turn over the written statements, the prosecutors denied their existence. Defendant alleged that the prosecution never turned over the written statements, even after it argued their existence as the reason for the mistrial. Further, defendant alleged that the mistrial was granted without her consent and without a manifest necessity for doing so.

¶ 28    In its response, the State alleged that the police never informed the prosecutors that defendant made a written statement. The State also alleged that the prosecutors made diligent pretrial efforts to obtain from the police department any written statements but were told that none existed. The State further alleged that the existence of the statements came to the prosecutors' attention on the second day of trial and that the prosecution "promptly" sent both written statements to defense counsel after the mistrial was declared. The State purportedly attached the statements as an exhibit to their response, but the record contains no such exhibit. Only a copy of a proof of service stating that "written statements" were served on defense counsel by email at 2:04 p.m. on the second day of trial was attached to the State's response.

¶ 29    Before ruling on defendant's motion to dismiss, the court made the following findings. On the morning of the first day of trial, the court was informed that Rodriguez was not present in court.

Although defense counsel sent subpoenas to the police department the previous week, counsel never spoke to the officers about their availability. Defense counsel also could not provide proof that the subpoenas were served on the officers. At trial, after Montano testified that he executed a written statement, defense counsel did not pursue obtaining that statement.

¶ 30 The court found that it declared the mistrial without defendant's "specific" consent. The court stated, however, that it believed that there was "no way" that defendant would not consent after having asked "three times for a mistrial herself."[2] The court ruled that there was a manifest necessity for the mistrial and denied the motion to dismiss. In discussing the factors that led to this decision, the court noted: (1) it did not consider any alternatives to a mistrial, (2) it acted in the heat of trial confrontation, (3) it considered the possibility that defendant's conviction would be reversed on appeal for ineffective assistance of counsel and because the written statements had not been tendered to the defense, (4) the mistrial was granted to protect defendant from prejudice, and (5) the decision to declare a mistrial rested on the fact that the trial was a "muddled mess" due to defense counsel's lack of trial preparation. The court explained that the domestic battery courtroom was high volume, with multiple jury trials scheduled on any given day, and that the court expected defense counsel to be prepared when answering "ready."

¶ 31 Defendant filed a timely notice of interlocutory appeal pursuant to Illinois Supreme Court Rule 604(f) (eff. July 1, 2017) (allowing appeals from orders denying motions to dismiss on double-jeopardy grounds).

¶ 32 II. ANALYSIS

_____

[2] The record shows that defendant requested a mistrial twice, although defense counsel also alluded to a motion for a mistrial that may have occurred off the record.

¶ 33 Defendant contends that the court abused its discretion in denying her motion to dismiss. Defendant asserts that the court acted hastily in declaring the mistrial without considering alternatives and without allowing defendant to object. The State argues that defendant consented to the mistrial or, alternatively, that there was a manifest necessity to declare a mistrial. We review for an abuse of discretion the denial of a motion to dismiss on double jeopardy grounds. *People v. Griffith*, 404 Ill. App. 3d 1072, 1079 (2010).

¶ 34                                          A. Double-Jeopardy Principles

¶ 35 The fifth amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The double-jeopardy clause applies to the states through the due process clause of the fourteenth amendment (U.S. Const., amend XIV). *Benton v. Maryland*, 395 U.S. 784, 787 (1969). The Illinois Constitution also prohibits placing persons in double jeopardy. Ill. Const. 1970, art. I, § 10 ("[n]o person shall *** be twice put in jeopardy for the same offense"). The Illinois double-jeopardy clause is construed in the same manner as the double-jeopardy clause of the fifth amendment to the United States Constitution. *People v. Staple*, 2016 IL App (4th) 160061, ¶ 13. In a jury trial, jeopardy attaches when the jury is empaneled and sworn. *People v. Bellmyer*, 199 Ill. 2d 529, 538 (2002).

¶ 36 The double-jeopardy protection embraces a defendant's "valued right" to have his trial completed by a particular tribunal. *Arizona v. Washington*, 434 U.S. 497, 503 (1978). Thus, the prosecution is generally entitled to only one opportunity to try a defendant. *Washington*, 434 U.S. at 505. However, retrial is permitted where the defendant moved for, or consented to, the mistrial. *People v. Dahlberg*, 355 Ill. App. 3d 308, 312 (2005). The defendant who requests or consents to

a mistrial is presumed to have waived his or her valued right to have the trial completed by the jury that was originally seated. *People v. Bagley*, 338 Ill. App. 3d 978, 981 (2003).

¶ 37    However, when a mistrial is declared without a defendant's consent, retrial is permitted only if there was a " 'manifest necessity' " for declaring the mistrial. *Washington*, 434 U.S. at 505; *People v. Street*, 316 Ill. App. 3d 205, 211 (2000).[3] In discussing the phrase "manifest necessity," the United States Supreme Court held that it cannot be interpreted literally but that a "manifest" necessity means a " 'high degree' " of necessity. *Washington*, 434 U.S. at 505-06. The prosecution shoulders a heavy burden of justifying a mistrial to avoid the double-jeopardy bar. *Washington*, 434 U.S. at 505. Whether a manifest necessity exists depends upon the particular facts, and a trial court's decision to declare a mistrial is reviewed for an abuse of discretion. *People v. Edwards*, 388 Ill. App. 3d 615, 625 (2009).

¶ 38                    B. Whether Defendant Consented to the Mistrial

¶ 39    The trial court found that defendant did not specifically consent to the mistrial. Rather, it believed when it declared the mistrial that "there was no way the defendant would not consent after asking for a mistrial three [*sic*] times." Nevertheless, the State argues that defendant *did* consent when she (1) moved twice for a mistrial and (2) did not object to the mistrial.

¶ 40    1. *Whether Rodriguez's Absence Was Causally Related to the Declaration of the Mistrial*

¶ 41    Defendant's motions for a mistrial were triggered by Rodriguez's absence. The mistrial was declared due to newly discovered evidence. The State tries to link Rodriguez's absence to the declaration of the mistrial by arguing that both related to "an underlying" issue of ineffective

---

[3] The "manifest necessity" doctrine was first articulated in *United States v. Perez*, 22 U.S. (9 Wheat.) 579 (1824).

assistance of defense counsel. Specifically, the State argues that defense counsel's failure to subpoena Rodriguez caused Rodriguez's absence. That error, the State argues, resulted in defense counsel's inability to obtain a stipulation that adequately presented defendant's claim of self-defense. The State asserts that when it merely agreed to defendant's earlier motions for a mistrial, it was protecting defendant's right to the effective assistance of counsel.

¶ 42    The State's argument is contradicted by the record. First, the court's written order declaring the mistrial stated that it was granted on the State's motion due to newly discovered evidence. The "newly discovered evidence" was written statements in the possession of the police department, over which defense counsel had no control.

¶ 43    Second, Rodriguez was absent because of illness. His absence surprised even the prosecutor, who promised the jury in her opening statement that Rodriguez would testify and corroborate Montano's version of the events. Whether defense counsel had Rodriguez under subpoena or not, Rodriguez was not able to appear because he had surgery.

¶ 44    The State makes the unfounded assumption that, had defense counsel known that Rodriguez was unavailable, the court would have granted defendant a continuance. That does not appear likely because the court ruled that Rodriguez's testimony as to defendant's exculpatory statement would be inadmissible hearsay. More important, a continuance until Rodriguez could be present would not have cured the State's failure to turn over the written statements in pretrial discovery. Their existence became known only because defense counsel questioned Vega on cross-examination about whether Montano executed a written statement.

¶ 45    Third, the stipulation to Rodriguez's testimony reflected what Rodriguez wrote in his police report. Rodriguez noted in his report—and the stipulation so recited—that defendant said that she punched Montano because he would not get out of her face. The stipulation also included

that Rodriguez did not note a hammer at the scene. It is reasonable to assume that Rodriguez would testify consistently with his report. Thus, there was nothing deficient in counsel's performance in obtaining that stipulation.

¶ 46     The State misconceives the purpose and effect of the parties' stipulation to Rodriguez's testimony. A stipulation is a "conclusive agreement" with respect to an issue before the court. *People v. Pablo*, 2018 IL App (3d) 150892, ¶ 17. A stipulation, being conclusive as to all matters included within it, cannot be attacked, or contradicted, by the defendant. *People v. Woods*, 214 Ill. 2d 455, 469 (2005). A stipulation to a witness's testimony obviates the need for the defense to subpoena the witness. *Pablo*, 2018 IL App (3d) 150892, ¶ 26. Thus, the issue of Rodriguez's absence was resolved by the stipulation. Whether defendant's statement to Rodriguez supported her claim of self-defense was for the jury to decide. If, as the State argues, the stipulation was not helpful to defendant, the State does not explain how such unhelpfulness caused the prosecution's nondisclosure of the written statements.

¶ 47     Fourth, the prosecutor did not argue a basis, other than her untimely disclosure of the existence of the written statements, for the mistrial. The prosecutor said:

"Our Officer Vega came up to us before the trial started and said that they have evidence of written statements by both the [d]efendant and the victim that were never turned over because of an indexing problem with records. At this time we are going to agree to a mistrial."

Nothing in those words hints that anything other than the missing statements spurred the mistrial.

¶ 48     Finally, the State's attempt to link defense counsel's performance to the missing written statements is fanciful. The police department's administrative snafu occurred long before, and

independently of, Rodriguez's absence at trial. Furthermore, the State cannot lay the police department's administrative mishaps at defense counsel's doorstep.

The State's reliance on this court's opinion in *People v. Lovinger*, 130 Ill. App. 3d 105 (1985), is misplaced. In *Lovinger*, the defendant moved for a mistrial after the prosecutor spoke with a police officer during a recess in the officer's testimony. *Lovinger*, 130 Ill. App. 3d at 108. Anticipating a motion for a mistrial, the court stated that it would deny a mistrial, even before defense counsel made the motion. *Lovinger*, 130 Ill. App. 3d at 107-08. However, after the prosecutor spoke with another witness during a recess in that witness's testimony, and defense counsel brought that infraction to the court's attention, the court *sua sponte* declared a mistrial. *Lovinger*, 130 Ill. App. 3d at 109-10. When declaring the mistrial, the court articulated additional reasons for its action. *Lovinger*, 130 Ill. App. 3d at 110-11. We affirmed the court's denial of the defendant's motion to bar retrial on double-jeopardy grounds, because the mistrial was declared, in part, on a ground that defendant had advanced. *Lovinger*, 130 Ill. App. 3d at 113-14. In *Lovinger*, unlike in the present case, there was a correlation between the reason the defendant moved for a mistrial and the reason the court declared the mistrial.

¶ 49    The Seventh Circuit Court of Appeals disagreed with our analysis and affirmed the district court's grant of *habeas corpus* in *Lovinger v. Circuit Court of the 19th Judicial Circuit*, 845 F.2d 739 (7th Cir. 1988) (*Lovinger II*). The court of appeals held that the trial court's articulation of alternative reasons for granting the mistrial attenuated any connection between the defendant's motion for a mistrial and the declaration of the mistrial. *Lovinger II*, 845 F.2d at 743-44. Here, defendant urges us to follow *Lovinger II*. However, as noted, the underlying facts in that case are distinguishable because of the correlation—even if attenuated—between the reason the defendant moved for a mistrial and the reason it was declared. In our case, no such correlation exists.

¶ 50    Also in contrast to our case is *People v. Roche*, 258 Ill. App. 3d 194 (1994). In *Roche*, the trial court used the appellation "Jesus Christ" as a swearword, on the record and in front of the jury, while ruling adversely on an objection by defense counsel, implying that the objection was ridiculous. *Roche*, 258 Ill. App. 3d at 196. The defendant moved for a mistrial. *Roche*, 258 Ill. App. 3d at 196-97. The court did not rule on the motion. *Roche*, 258 Ill. App. 3d at 197. Instead, the court went on to other business. *Roche*, 258 Ill. App. 3d at 197. However, the next morning, as soon as the jury was brought in, the court declared a mistrial. *Roche*, 258 Ill. App. 3d at 197-98. The defendant appealed the court's denial of his motion to dismiss on double-jeopardy grounds, arguing, *inter alia*, that his motion for a mistrial was not pending when the judge declared a mistrial. *Roche*, 258 Ill. App. 3d at 198. This court disagreed, saying that "[v]ery little happened" between the motion for a mistrial and its declaration, except that the trial court considered the matter overnight. *Roche*, 258 Ill. App. 3d at 199-200.

¶ 51    In our case, much happened between when the court denied defendant's motions for a mistrial and when it declared the mistrial: (1) the parties stipulated to Rodriguez's testimony, (2) Vega informed the prosecutors that the written statements existed, (3) the court and the parties finished the instructions conference and disposed of the State's motion *in limine*, (4) defendant presented almost her entire case-in-chief, and (5) and the prosecutor informed the court and defense counsel of the existence of the undisclosed written statements. Even if these events had not intervened, we would determine that there never was a nexus, because Rodriguez's absence simply was not related to the State's nondisclosure of the written statements. Accordingly, we hold that defendant's prior motions for a mistrial did not constitute consent to the mistrial.

¶ 52         2. *Whether Defendant Failed to Object to the Declaration of the Mistrial*

¶ 53 A defendant's failure to object to the declaration of a mistrial, despite having the opportunity to do so, and his conduct after the mistrial is declared can evince acquiescence to the mistrial. *People v. Camden*, 115 Ill. 2d 369, 378-79 (1987). Here, defendant argues that she had no opportunity to object before the mistrial was declared, where defense counsel asked to be heard but was silenced by the court. The State argues that defense counsel could have persisted and would have been heard. The State further argues that it was reasonable for the court to assume that defendant would agree to the mistrial, based on her earlier motions.

¶ 54 The record shows that, at a sidebar, upon the prosecutor's representation that the State would "agree" to a mistrial, defense counsel *straightaway* interjected: "Judge, can I be heard on that?" The court told defense counsel: "Not at this time." The court then declared the mistrial in front of the jury and sent the jury to the jury room.

¶ 55 The judge immediately excused herself from the bench to speak with the discharged jurors. When the judge resumed the bench, she asked the State if it wanted another date to retry defendant. A colloquy ensued among the court, the prosecution, and defense counsel over a mutually agreeable date for the retrial. As soon as that date was established, defense counsel stated: "I would like to preserve my objection, for the record, that I was not allowed to argue about the mistrial." The court stated: "Well, argue it now. You have one minute. Argue."

¶ 56 The issue is whether defendant had an adequate opportunity to object before the jury was discharged. See *Dahlberg*, 355 Ill. App. 3d at 313 (holding that the defendant did not consent to the mistrial where he did not have an adequate opportunity to object before the jury was discharged). A defendant's failure to object to an expressly contemplated declaration of a mistrial manifests consent only when the defendant has been given a sufficient opportunity to object. *State*

*v. Leon-Simaj*, 913 N.W.2d 722, 730 (Neb. 2018); *Ex Parte Montano*, 451 S.W.3d 874, 878 (Texas Ct. App. 2014).

¶ 57     In *Camden*, our supreme court held that the defendant's conduct constituted acquiescence where defense counsel stood mute when a juror claimed that he could not render a fair verdict, the court stated that there would be another trial, and the case was set for another trial by agreement. *Camden*, 115 Ill. 2d at 377-79. This court reached the opposite conclusion in *Dahlberg*, where the trial court cut defense counsel off after the State moved for a mistrial and then immediately declared the mistrial. *Dahlberg*, 355 Ill. App. 3d at 313. In *Bagley*, 338 Ill. App. 3d at 981-82, we held that defense counsel's conduct did not amount to acquiescence where counsel "forcefully" argued that the trial should continue before the court's declaration of the mistrial.

¶ 58     The present case is unusual because we do not have to infer what happened entirely from the report of proceedings. The court acknowledged that it declared the mistrial without "giving [defense counsel] even a chance to respond [to the State's agreement to a mistrial]." The court elaborated: "And I never—it is correct that I never asked for [defense counsel's] input at that time." The State's assertion that, had defense counsel persisted, the court would have entertained his argument is gainsaid by the record. Throughout the proceedings, the court displayed impatience with counsel, cutting off his arguments.

¶ 59     We believe that the present case is analogous to *Dahlberg*. In *Dahlberg*, which was a prosecution for domestic battery, defense counsel cross-examined the victim about domestic battery complaints that she had filed against past suitors. *Dahlberg*, 355 Ill. App. 3d at 310. The State moved for a mistrial. *Dahlberg*, 355 Ill. App. 3d at 310. When defense counsel began to explain why he was entitled to pursue that subject, the court cut counsel off, admonishing that counsel should have raised the matter *in limine*. *Dahlberg*, 355 Ill. App. 3d at 310. Immediately,

the court declared a mistrial. *Dahlberg*, 355 Ill. App. 3d at 310. This court held that, under those circumstances, the defendant did not impliedly consent to the mistrial. *Dahlberg*, 355 Ill. App. 3d at 313.

¶ 60     We also reject the State's argument that it was reasonable for the court to assume that defendant would agree to the mistrial because she had previously moved for a mistrial on other grounds. In effect, the State asks us to hold that a defendant who moves unsuccessfully for a mistrial on one ground thereafter consents to the declaration of a mistrial on any other, unrelated ground. We decline to so hold, because trials are never static. A defendant may see his or her fortunes improve over the course of the trial. We are mindful that it is a *defendant's* valued right to have his or her trial completed by a particular tribunal. *People v. Kimble*, 2019 IL 122830, ¶ 29. Consequently, the defendant must determine whether to consent to a particular motion for, or declaration of, a mistrial. To that end, we hold that the trial court must explicitly, and on the record, afford the defendant who so requests the adequate opportunity to object to the declaration of a mistrial, even where the defendant has previously moved for a mistrial on the same or other grounds.

¶ 61                    C. Whether There Was a Manifest Necessity for the Mistrial

¶ 62     Having determined that defendant did not consent or acquiesce to the mistrial, we turn to whether there was a manifest necessity for the mistrial. Whether a manifest necessity warranted a mistrial depends upon the facts of each case. *Street*, 316 Ill. App. 3d at 211. To aid its determination, the reviewing court may consider the following nonexclusive factors: (1) whether the difficulty was the product of the actions of the prosecution, defense counsel, or trial judge or whether it was the product of events over which the participants had no control; (2) whether the difficulty could have intentionally been created or manipulated by the State to strengthen its case;

(3) whether the difficulty, prejudice, or other legal complication could have been cured by another alternative that would have preserved the trial's fairness; (4) whether the trial judge actually considered other alternatives to a mistrial; (5) whether a subsequent conviction would likely be reversed on appeal; (6) whether the trial judge acted in the heat of trial confrontation; (7) whether the judge's decision rested on an evaluation of the participants' demeanor, the atmosphere of the trial, or any other factors not amenable to strict appellate review; (8) whether the judge granted the mistrial to protect the defendant from possible prejudice; (9) whether the State's evidence, prior to the mistrial, evidenced a weakness in its case; (10) whether the jurors heard enough of the case to form tentative opinions; (11) whether the case had proceeded so far as to give the State a substantial preview of the defense's tactics and evidence; and (12) whether the jury composition was unusual. *Street*, 316 Ill. App. 3d at 211-12.

¶ 63     Here, under factors (1) through (3), the difficulty that caused the mistrial is at issue, although the record here leaves no doubt about what happened. Defendant made a pretrial motion for discovery, in which she asked that the State turn over any statements that she made, as well as evidence favorable to her. The prosecution continually denied that any written statements existed. During trial, two prosecution witnesses, Officers Johnson and Vega, testified, in response to defendant's questions, that Montano did not make a written statement. On the second day of trial, after defendant had presented almost her entire case-in-chief, the prosecutor disclosed that Vega told her, before trial began that morning, that both defendant and Montano had executed written statements. The prosecutor stated that she agreed to a mistrial. The prosecutor did not produce the written statements to the court or to defendant, nor did the court inquire as to the contents of those statements. Defense counsel asked to be heard *at that moment*, and the court denied him the

opportunity. The court then declared a mistrial and discharged the jury. In its written order, the court noted that the mistrial was granted on the State's motion, due to newly discovered evidence.

¶ 64    Yet, the State argues that the mistrial was caused by defense counsel's failure to render effective assistance in (1) failing to obtain necessary witnesses for trial, (2) failing to obtain the missing written statements, and (3) failing to obtain an adequate stipulation to Rodriguez's testimony. As discussed, Rodriguez was absent due to illness. The court denied defendant's motion for a continuance until Rodriguez could be present, ruling that Rodriguez's testimony about defendant's exculpatory statement would be inadmissible hearsay. Rodriguez's absence, as well as the State's hearsay objection, became moot when the parties stipulated to his testimony. The record shows that the stipulation matched what Rodriguez had recorded in his report. Although other officers, who defense counsel thought were under subpoena, failed to appear for trial, there is nothing indicating that those officers were critical to defendant's case, as Rodriguez was the lead investigative officer and he wrote the report containing defendant's exculpatory statement.

¶ 65    The State faults defense counsel for not pursuing the missing written statements after Montano testified that he executed a written statement. However, defense counsel followed up by asking the State's two police witnesses whether Montano gave a written statement. Johnson denied knowing of any such statement, and Vega, who took Montano's complaint, testified that there was no such statement.[4] Defense counsel is entitled to rely on the State's response to his or her

---

[4] At the hearing on defendant's motion to dismiss, defense counsel indicated that he was not so concerned about defendant's written statement, as defendant contended that it was consistent with her self-defense position. Indeed, the morning that Vega disclosed to the prosecution the existence of the statements, the prosecution moved *in limine* to bar defendant from

discovery requests and assume that the State had accurately disclosed all the impeaching information within the knowledge of the State's agents. *People v. Olinger*, 176 Ill. 2d 326, 362 (1997). Consequently, we reject the argument that the mistrial was necessitated by defense counsel's ineffectiveness. The question is whether the State's discovery violation warranted the mistrial.

¶ 66    Where the trial court grants a prosecutor's motion for a mistrial, the prosecutor bears the heavy burden of justifying the mistrial. *People v. Largent*, 337 Ill. App. 3d 835, 841 (2003). For a " 'manifest necessity' " to exist (*People v. Shoevlin*, 2019 IL App (3d) 170258, ¶ 26 (quoting *Street*, 316 Ill. App. 3d at 211)), the circumstances must be " ' " 'very extraordinary and striking' " ' " (*Shoevlin*, 2019 IL App (3d) 170258, ¶ 26 (quoting *Largent*, 337 Ill. App. 3d at 840, quoting *Downum v. United States*, 372 U.S. 734, 736 (1963), quoting *United States v. Coolidge*, 25 F. Cas. 622, 623 (D. Mass. 1815) (No. 14,858))). In *Downum*, the Supreme Court of the United States opined that such circumstances must be an "imperious necessity." *Downum*, 372 U.S. at 736. Further, the doctrine of manifest necessity requires the trial court to scrupulously exercise judicial discretion to determine that the ends of public justice would not be served by continuing the proceedings. *Street*, 316 Ill. App. 3d at 211.

¶ 67    In *Street*, the court held that the trial court abused its discretion in declaring a mistrial where it failed to consider any other alternative and failed to articulate any reason for rejecting alternatives. *Street*, 316 Ill. App. 3d at 213. "A trial judge must first consider all reasonable

---

using any prior consistent statements to bolster her testimony. That motion *in limine* indicates that the State knew of the written statements when it filed the motion, yet it did not disclose their existence until after defendant had nearly completed her case-in-chief.

alternatives before granting a mistrial in a criminal case." *People v. Kuhfuss*, 241 Ill. App. 3d 311, 318 (1993). Indeed, the standard of manifest necessity is not met, and retrial is barred, if the problem giving rise to the declaration of a mistrial could have been corrected without aborting the proceeding. *Kuhfuss*, 241 Ill. App. 3d at 318.

¶ 68 Here, the court acknowledged that it did not consider alternatives before declaring the mistrial, such as a recess for defendant to review the statements to determine the best course of action or recalling Montano so that defendant could cross-examine him about the statement. The State argues that, in ruling on defendant's motion to dismiss, discussion of alternatives was speculative because defendant did not make the written statements part of the appellate record. The State suggests that this issue must be raised in a postconviction petition because it is *de hors* the record. The States cites *People v. Wrencher*, 2015 IL App (4th) 130522, ¶ 23, for the proposition that a party may not rely on matters outside the appellate record to sustain his or her position on appeal.

¶ 69 The State's argument misses the mark. First, the court had to consider alternatives *before* it declared the mistrial. If less drastic alternatives were available, they should have been employed. *Harris v. Young*, 607 F.2d 1081, 1085 (1979). Second, the *prosecution* failed to tender the written statements to the court and defendant when it disclosed their existence and prompted the mistrial. The court then foreclosed defendant's valued right to have the jury she selected decide her fate without knowing whether the written statements even prejudiced her.

¶ 70 A mistrial for a discovery violation is not an appropriate sanction where a recess or a continuance would protect the defendant from surprise or prejudice. *People v. Pondexter*, 214 Ill. App. 3d 79, 85 (1991). Here, defense counsel's cross-examination brought out weaknesses in Montano's testimony. Montano went to his office for two hours instead of reporting the crime

immediately. Montano testified that he did not argue with a "violent" defendant but "pretty much" "sat back" and watched while she played the compromising video on his phone, testimony that the jury could have found to be incredible. Montano was also combative with defense counsel, asking him which of two versions of events defense counsel would like. It is possible, had the court recessed to demand that the State disclose the contents of Montano's written statement, that the court might have determined that the discovery violation did not prejudice defendant and no mistrial was necessary.

¶ 71    Further, the State waited until defendant had almost completed her case-in-chief before bringing the discovery of the written statements to the court's attention, even though the State knew about them before the trial started that morning and even though the prosecutor filed a motion *in limine* that morning to bar defendant from using a prior consistent statement. Delaying gave the State a significant advantage because Matthew and Noah were locked into their testimony that they did not see what happened.

¶ 72    We also note the court's acknowledgement that it acted in the heat of trial confrontation when it declared the mistrial without affording defendant the opportunity to be heard. The record shows that defense counsel perhaps seemed inexperienced, but he certainly was not incompetent. Defense counsel persevered in getting Rodriguez's testimony before the jury, even though counsel struggled to obtain the stipulation, which he needed a supervisor to approve. Thus, the court's conclusion that the trial was a "muddled mess" because of defense counsel's ineptitude is not supported by the record. The record shows that the court was impatient with counsel for insisting that Rodriguez was a necessary witness, cutting off counsel's arguments repeatedly. The conclusion is inescapable that the court declared the mistrial, at least in part, from frustration that defense counsel was slowing down the proceedings. The amount of time the judge devotes to the

mistrial decision is significant in determining whether there was a manifest necessity for the mistrial. *Brady v. Samaha*, 667 F.2d 224, 229 (1st Cir. 1981). Here, the court declared the mistrial almost simultaneously with the State's suggestion that it do so.

¶ 73     We understand the court's concern for keeping to its schedule so that other litigants' cases could be timely heard. However, "[a] precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicate insufficient concern for the defendant's constitutional protection." *Brady*, 667 F.2d at 229. Consequently, we determine that the court failed to exercise "sound" and "conscientious" discretion in declaring the mistrial. See *United States v. Jorn*, 400 U.S. 470, 481 (1971) (it is the judge's responsibility to exercise faithful, sound, and conscientious judgment when deciding whether to discharge a jury from giving a verdict.) Accordingly, we hold that the court abused its discretion in denying defendant's motion to dismiss the charges.

¶ 74                              III. CONCLUSION

¶ 75     For the reasons stated, we reverse the judgment of the circuit court of Kane County.

¶ 76     Reversed.

---

**No. 2-19-0476**

---

| | |
|---|---|
| **Cite as:** | *People v. Kosobucki*, 2021 IL App (2d) 190476 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 18-CM-1955; the Hon. Alice C. Tracy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Anthony J. Santella, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---