2022 IL App (1st) 191702-U

No. 1-19-1702

Second Division
August 9, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 09 CR 10152 |
| v. | ) | |
| | ) | |
| TERRELL IVY, | ) | Honorable |
| | ) | Domenica Stephenson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's judgment is affirmed where defendant's retrial after a mistrial was not barred by double jeopardy and the evidence was sufficient to prove defendant guilty of attempted first degree murder and being an armed habitual criminal.

¶ 2    Following a retrial, defendant was found guilty of attempted first degree murder (720 ILCS 5/8-4, 9-1 (West 2008)) and being an armed habitual criminal (720 ILCS 5/24-1.7 (West 2008)) and sentenced to 90 years' imprisonment. Defendant appeals from the trial court's judgment upon

retrial arguing that: (1) his conviction should be vacated pursuant to the double jeopardy clause of the United States and Illinois Constitutions where defendant did not consent to the mistrial, prosecutorial misconduct intentionally created the manifest necessity for a mistrial, and the State's misconduct constituted reversible error which would have resulted in reversal of his conviction from the first trial; and (2) the evidence was insufficient to prove defendant guilty beyond a reasonable doubt of attempted first degree murder and being an armed habitual criminal. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4                                 A. Pre-Trial Proceedings

¶ 5     On June 17, 2009, defendant was charged by indictment with 22 counts related to a shooting occurring on June 21, 2008, near 44th Street and Greenwood Avenue in Chicago, which resulted in injury to Mark Lightfoot.

¶ 6     Relevant here, on August 3, 2011, there was a hearing on the State's petition to terminate bail. At the hearing, the State explained to the court that the victim, Lightfoot, had reported to the police that he received threatening phone calls suggesting that if he does not accept $10,000 and sign an affidavit recanting his identification of defendant as the shooter at defense counsel Dan Franks' office, he would be murdered. The individual who made the phone calls was later identified as Maurice Perry, and he was subsequently prosecuted for bribery and intimidation of a witness. The State argued that this information supported their claim that defendant was a real and present threat, and as such, defendant should be held in custody without bail. To this point, Franks responded that the allegations were false, defendant was in custody at the time of the alleged phone calls, and no one ever came to his office. He further stated that he was not aware of any police

reports of this incident and that if anything further occurred, he would like to be informed. Ultimately, the court granted the State's petition to terminate defendant's bail.

¶ 7     On October 25, 2011, defendant filed a motion to reconsider termination of bond. Therein, defendant specifically referenced parts of the State's petition, stating that Lightfoot had received multiple threatening phone calls directing him to sign a recantation statement at Franks' office "or he will have his head blown off after he testifies." Defendant then asserted that he had no knowledge of any alleged contact with Lightfoot. The motion was denied.

¶ 8                                      B. First Bench Trial

¶ 9     Defendant's first bench trial commenced on May 28, 2013. The State presented several witnesses on May 28 and May 29.

¶ 10    On May 30, 2013, the third day of trial, the State requested a conference with the trial judge, defense counsel, and defendant. During this conference, the State informed the court that it had "just learned some new information[.]" The State reminded the court of the allegations made prior to trial regarding the threatening phone calls to Lightfoot and stated that Perry had been prosecuted and convicted. However, that day Lightfoot had informed the State of the following:

> "[L]ast night and kind of into this morning, [Lightfoot] was contacted by an individual who indicated [Franks] had reached out to mutual friend or an acquaintance of his and indicated to that friend that he wanted him to try to throw a monkey wrench into the situation and a way of doing that would be to reach out to [Lightfoot] *** and to ask him to say that he did not get a look – that he thinks that [defendant] might be the shooter and therefore, change his identification testimony."

¶ 11    Franks immediately responded, asserting repeatedly that he had not spoken with Lightfoot and he did not know anything about these allegations.

¶ 12    The court noted that they are in the middle of trial and the State brought forward allegations that had not been substantiated at that point. Further, the court stated it would not consider the allegations at all and then asked how Franks would like to proceed. Franks responded: "We can proceed with the trial. I have not decided how I am going to proceed after this. But Your Honor said you won't consider it. I took a bench trial. I'm quite willing to proceed." Subsequently, the trial resumed.

¶ 13    The State called Lightfoot as a witness. During defendant's recross-examination, Franks asked Lightfoot, "When is the next time you talked to Detective Gorman?" Lightfoot responded: "I talked to Detective Gorman when I had got that phone call and you had asked me to come into your office and take $10,000 and sign an affidavit to release Terrell Ivy, I told him about that." Franks then requested a sidebar.

¶ 14    During the sidebar, the court first struck Lightfoot's answer and noted that it would not be considered. Franks stated: "Judge, I am at a point here now, I appreciate that, but I don't know if I should withdraw from this case and testify or if I should cross-examine this witness about his delusional and paranoid fantasies because I have [Det.] Gorman's report." He pointed out that in the prosecution of Perry it was never alleged that Franks ever spoke to Lightfoot. Franks also noted that he would have withdrawn from the case if his name had been mentioned in the bribery and witness intimidation case and that there had been no objection to him remaining as defense counsel. He further requested that any documents related to the case involving allegations specifically against him be disclosed. The State clarified that it had brought up the prior incident because it was related to the new allegations from Lightfoot that day.

¶ 15    Finally, the court stated:

"What we're going to do is this: It seems like a big stretch to me as far as what is being alleged. I would have thought the whole thing would have been investigated when this other person was charged and it gone into at that time. I'm a little at a loss as to why it wasn't. *** And the allegations that you brought up now create a huge issue and problem for this trial. We're going to have to hold this whole matter over until Monday and I'm going to decide what we're going to do. *** There's questions of whether or not defense counsel can now testify. There's all kinds of other allegations. I think [Franks] was referring to a possible mistrial earlier and whether or not that needs to be granted and whether or not we need to change attorneys at this point. So there is a few different issues we need to look at."

The trial was then continued until the following Monday.

¶ 16    On June 3, 2013, the fourth day of trial, the trial court declared a mistrial citing to *In re Himmel*, 125 Ill. 2d 531 (1988), and Judge Goebel recused himself from the case. Franks responded, "Wonderful."

¶ 17    A week later, on June 10, 2013, the parties came before the court and Franks stated that he was "immediately objecting to the mistrial so there's no indication I'm consenting in any way to the mistrial[.]" A corresponding motion was also filed that day objecting to the mistrial.

¶ 18    On June 17, 2013, the State filed a motion to disqualify Franks as defendant's counsel. The motion set forth Lightfoot's allegations against Franks. The State argued that although the allegations against Franks were not relevant to the case at bar, the allegations did implicate the witness-advocate rule creating a conflict of interest. Franks later withdrew from the case, rendering the State's motion to disqualify moot, and Michael Walsh entered his appearance on behalf of defendant.

¶ 19    On June 24, 2013, defendant filed a motion to dismiss based on double jeopardy. The State filed a response and defendant filed a reply. On February 21, 2014, the trial court denied the motion to dismiss after determining that Judge Goebel was justified in declaring a mistrial due to "manifest necessity" that was not the result of the State's conduct. Defendant subsequently filed a motion to reconsider denial of the motion to dismiss. This motion was also denied.

¶ 20                                    C. Second Bench Trial

¶ 21    On September 14, 2015, the second bench trial commenced.

¶ 22    Alec Craig testified that Lightfoot was his cousin. He drove to the area of 44th Street and Greenwood Avenue around 5 p.m. to meet Lightfoot. It was still daylight at this time. He noticed Lightfoot on the street socializing with a group of people. He approached the group while he was talking on the phone. At that time, he noticed a man wearing a brown hooded sweatshirt with the hood pulled over his head walking towards the group. He was partially able to see the man's face, and in court, he identified the man as defendant. Craig then heard gunshots and saw everyone run away from the area. The only two people remaining were defendant and Lightfoot. Craig ran towards his vehicle. He turned around and observed Lightfoot on the ground and defendant standing over him with a gun pointed at Lightfoot. Craig heard at least five more gunshots. At this point, defendant's hood was no longer up and Craig could clearly see his face. Craig, thinking that the situation was not safe, left the area in his vehicle. He did not see where defendant went after the shooting, and he did not contact the police. He testified that he presumed that other individuals that Lightfoot was with that day would have given the police their witness accounts of the shooting.

¶ 23    Craig next saw Lightfoot at a funeral several days after the shooting. They briefly spoke, and Craig told Lightfoot that he was present at the time of the shooting. No further conversation about the shooting was had at that time. In May 2009, Lightfoot contacted Craig and asked him to

speak to the detectives investigating the shooting. He met with the detectives at the police station and viewed a physical lineup. From the lineup, Craig identified defendant as the shooter. That day, he also gave a statement to an assistant state's attorney. Craig further testified that he was not familiar with defendant prior to the shooting and that Lightfoot did not instruct him on what to tell the detectives.

¶ 24     Chicago police detective Daniel Gorman testified that he was assigned to investigate the June 21, 2008 shooting of Lightfoot. That evening, he went to the scene of the shooting. From the sidewalk and street on the 4400 block of Greenwood, law enforcement collected five fired .40-caliber shell casings and two bullet fragments. The parties later stipulated that the five shell casings were fired from the same gun. He also observed blood stains on the sidewalk as well as a tan blazer that had what appeared to be bloodstains on it.

¶ 25     That evening, Det. Gorman went to the hospital to meet with Lightfoot. Lightfoot had been shot eight times. At the hospital, Lightfoot informed Det. Gorman that he knew the person who shot him as "T-Dog"[1] but he did not know his actual name. He described him as 5'11", 160 pounds, and bald. Det. Gorman met with Lightfoot at the hospital a few days later and received more information about the shooter. He learned that the shooter was between 20 and 30 years old, had facial hair, and had a child with a woman known as "Peedee Weedee."

¶ 26     From this information, Det. Gorman generated a photo array for Lightfoot to view. On June 24, 2008, Lightfoot made an identification when presented with the photo array. From the array, he identified defendant as the individual who had shot him. Det. Gorman put out an investigative alert for defendant thereafter.

---

[1] This alias is also written as "T-Dawg" in some documents.

¶ 27    Chicago police officer Arthur Davis was near the area of the shooting around 5:30 p.m. on June 21, 2008. He heard five to seven gunshots and drove towards the area where he found Lightfoot lying on the ground on his back. Lightfoot was conscious at the time and stated that T-Dog was the shooter. He described him as between 5'8" and 5'10", bald with facial hair, about 150 to 180 pounds, and wearing a brown hooded sweatshirt. On cross-examination, Officer Davis acknowledged that Lightfoot told him that "Mr. Reese Bo and the offender were in a vehicle together" but this was not included in the report. He noted that his report stated that Lightfoot told him that he saw defendant drive by with "known male black Cashell *** Will" prior to the shooting.

¶ 28    Chicago police detective Nicole Price testified that defendant was arrested on May 20, 2009 pursuant to an investigative alert. Det. Price spoke with Craig at the police station on May 21, 2009, at which time Craig identified defendant in a physical lineup as the shooter. Det. Price noted that defendant was about 6'1", 160 pounds, and was bald with facial hair.

¶ 29    Lightfoot was then called as a witness. He acknowledged his prior convictions for possession of drugs and battery. He testified that on the evening of June 21, 2008, about 5 p.m., he was near the 4400 block of Greenwood, drinking alcohol and socializing with friends. He had been at a funeral that day and was wearing dress clothes including a tan blazer. A man known as Little Marvin handed him a cell phone. Lightfoot had a brief conversation with Cashell Will on the phone and handed the phone back to Little Marvin.

¶ 30    Soon after, Lightfoot noticed a "suspicious car" driving past the area. Will was driving with a cell phone to his ear. He also observed an individual in the front passenger seat, who he believed to be Reese Bo, and also someone in the backseat. Lightfoot heard Will's voice projecting through the speaker of Little Marvin's phone. Little Marvin then quickly turned the phone off. A

few minutes later, Lightfoot observed a man wearing a brown hooded sweatshirt with the hood over his head jogging around the corner towards the group. The man slowed to walk as he approached, and when he was about 25 feet away, he removed the hood. Lightfoot immediately recognized the man as defendant, who he had known for a few years. Lightfoot testified that he did not have any issues with defendant and he turned away to continue talking to his friend. His friend suddenly ran away, and when Lightfoot turned around, he saw defendant with a gun in his hand. At this time, it was still daylight out and he had a clear view of defendant's face. Defendant then raised the gun, aimed it at Lightfoot, and began firing. Lightfoot testified that he was shot in the arm and the stomach. Lightfoot began to run away but he ran into a stop sign and fell onto his back. Defendant ran over, stood directly over Lightfoot, and fired several more shots. At first, Lightfoot was kicking his legs in the air trying to defend himself but eventually he pretended to be dead until defendant left.

¶ 31 Lightfoot was still lying on the ground when the police arrived. He stated that University of Chicago police officer Gordon Dameron was the first on the scene with him, and he informed him that T-Dog shot him. Moments later, Lightfoot informed Officer Davis the same and that the individual was wearing a brown hooded sweatshirt. He also briefly spoke with Det. Gorman at the hospital and gave him the same information. He remained in the hospital for a week, and he underwent surgery. He suffered nerve damage as a result of the gunshots.

¶ 32 A few days later, on June 24, the detectives visited him at the hospital and showed him a photo array, from which he identified defendant as the shooter. Almost a year later, on May 21, 2009, the detectives requested that he come to the police station to view a physical lineup. From the lineup, he again identified defendant as the individual who shot him. He once again identified defendant as his shooter at the preliminary hearing.

¶ 33    About a week after he was shot, Lightfoot attended a funeral and spoke with Craig there. The conversation did not last long, but Craig informed him that he was present at the time of the shooting. Lightfoot maintained that he did not give the detectives Craig's name as a witness; he believed that they already were aware of Craig.

¶ 34    Finally, the State introduced into evidence certified copies of defendant's prior convictions for possession of a controlled substance with intent to deliver in 1997 and aggravated unlawful use of a weapon in 2002. The State rested. The court denied defendant's motion for a directed finding.

¶ 35    The defense began with the testimony of Damion Seats. Seats testified that he is currently imprisoned at the Iowa State Penitentiary as a result of a murder conviction for which he was serving a sentence of 60 years. He previously resided in Chicago until 2008. He testified that he was involved in a shooting at 44th Street and Greenwood Avenue, but he could not recall the exact date of the shooting. On that day, he received a "chirp," which is essentially a voice message via cell phone, from an individual named Marvin Dickerson, who he knew from school. After receiving the chirp, he took a gray, semi-automatic gun with a "30-round clip" from his aunt's house, put on a brown hooded sweatshirt and walked to 44th and Greenwood.

¶ 36    As he approached the area, he put on a ski mask and pulled the hood over his head with the strings of the hood pulled tight. He observed about 10 or 15 people scattered in the area but there were three men standing together, including Dickerson and Lightfoot. Dickerson nodded towards Lightfoot, indicating to Seats that he was the target. Seats was not familiar with Lightfoot at the time of the shooting. Seats stated that Lightfoot was wearing a brown "vest" or "suit jacket" and had his back towards Seats. He removed the gun from his pocket, and when he was "maybe 9 feet away" from Lightfoot, he began firing. He fired 4 or 5 times, and after Lightfoot fell, he walked

up to him and fired 4 or 5 more times. At that point, Lightfoot was on his side. Believing Lightfoot to be dead, Seats fled the area.

¶ 37    Seats confirmed that in 2013, while incarcerated in Iowa, he sent a letter to the Cook County Sheriff's Office admitting his involvement in the shooting. In the letter, he stated that the shooting took place on 45th Street and Berkeley Avenue, as opposed to 44th and Greenwood. He explained that he did not know the names of streets well. When asked why he decided to send the letter and testify about the shooting, he responded, "I feel as though I know how it feel[s] to be arrested for something you didn't do and then be convicted of it, and I put [defendant] in a very bad situation." He continued, "[I]t was just the right thing to do." After sending the letter, he spoke with law enforcement on two separate occasions prior to trial and he also spoke with defendant's investigator. Finally, he acknowledged that he met defendant twice in 2008 prior to this shooting, and they were both involved in the Black Disciples gang.

¶ 38    On cross-examination, he admitted that he did not know where the first shot hit Lightfoot, whether in the back or not but that he started firing when Lightfoot's back was turned away from him. He further admitted that defendant was friends with his brother, Devin Seats, and that it was his brother who informed him that defendant was arrested for the shooting, although he could not remember when his brother gave him this information. He acknowledged that his brother was incarcerated in Illinois, but he did not recall when he went to prison. He further testified that no one suggested that he write the letter. He eventually admitted that part of the reason he sent the letter was because he wanted to serve his sentence in Illinois where his brother was in custody and where his family lived.

¶ 39    The State questioned Seats on his conversations with Chicago police detectives after he sent the letter. Seats acknowledged that he met with a detective (Chicago police detective Patrick

Deenihan) on November 19, 2013 and confessed to shooting Lightfoot. He affirmed that he first informed Det. Deenihan of the following regarding the shooting. He was in a vehicle with two other individuals, one known as "Cash." They went to 45th Street and Woodlawn Avenue or Berkeley Avenue and stopped in an alley. They had been informed that they were to shoot an individual who was at that location. Cash handed Seats a gun and instructed Seats to shoot this individual, who Seats believed to be the victim in this case. Seats was not aware of this individual's name at the time, but he later testified that he believed his name may have been Mark or Melvin. Seats exited the vehicle and approached a group of people.

¶ 40    Seats denied that, as the conversation went on, he began crying, apologized for lying, and stated that he was not actually the shooter. Seats admitted that he informed Det. Deenihan that he was actually in the group of people with Lightfoot on the day of the shooting and he witnessed defendant shoot Lightfoot. He acknowledged that he informed the detectives that his brother had been sending him letters suggesting that he could help get defendant out of prison.

¶ 41    The second conversation occurred on December 11, 2013, with Det. Deenihan and assistant state's attorney Alex Molesky (ASA Molesky). On that day, Seats gave a signed statement prepared by ASA Molesky. In that statement, which was introduced into evidence, Seats related the following. He became a member of the Black Disciples in 2004, and defendant, Head, and Cash were high ranking members of the Black Disciples. On the day of the shooting, Seats was standing next to Dickerson when he received a "chirp" from Cash and Lightfoot was also standing nearby. He later saw a man wearing a brown hooded sweatshirt with the hood up walking towards the group. He saw the man pull a gun from his pocket and aim it at Lightfoot when they were a few feet apart. Seats heard gunfire and saw Lightfoot begin to run and ask, "T-Dog, why are you doing this to me?" Seats also felt one of these bullets go through his jacket. As Seats was standing

behind a car, he saw the man chase after Lightfoot who soon fell, stand over him, and fire several more shots at Lightfoot. At no point was Seats able to see the man's face and he could not identify him. Seats was walking away from the area with Dickerson, who stated that T-Dog was the one who shot Lightfoot. Seats saw defendant later that night at Cash's house and he heard defendant admit to the shooting. He also saw the brown hooded sweatshirt on the back of defendant's chair.

¶ 42    In May of 2013, Seats' mother, Barbara Spieker, and his brother suggested that he speak with an individual known as "Head." He spoke with Head sometime between May and August of 2013, and Head suggested that because Seats was already serving a life sentence and he was present on the day of the shooting, he should contact the police and confess to being the actual shooter rather than defendant. Head did not promise Seats anything in return. Further, Seats wanted to serve the rest of his sentence out in Illinois. He informed his mother that he was going to write a letter to the police claiming to be the shooter and she said that it was a bad idea.

¶ 43    The statement concluded with Seats attesting that he was treated well by the police and ASA Molesky, he was given food and drink, and no threats or promises were made to him in exchange for his statement. The final sentence stated: "Damion *** understands that [the statement] will have no effect on his case which is currently in the Iowa Appellate Court."

¶ 44    Seats then testified that, sometime after giving this statement, he informed his attorney that "these officers" threatened him that if he did not change his original statement confessing to the shooting, it would "mess up" his appeals. After his attorney informed him that his statement would not affect his current case in Iowa, Seats decided that he would tell "the truth of what happened *** that [he] had committed the *** attempted murder on [Lightfoot]."

¶ 45    On redirect examination, Seats explained that he changed his statement after originally confessing to the shooting because Det. Deenihan stated that defendant had already been

convicted, his statement was going to get people "in trouble" because they convicted an innocent man, and his statement would hurt his appeals.

¶ 46    Finally, on re-cross examination, Seats confirmed that his statement reflected that he had been treated well by the police and that no threats or promises were made in conjunction with his statement.

¶ 47    Neidra Powell testified that she was defendant's friend and had known him for 15 years. She testified that on June 21, 2008, she hosted a barbecue at her house on the 6000 block of South Rhodes Avenue. She testified that this was about nine blocks from Greenwood. Powell stated that defendant arrived by 7 a.m. and stayed until 2 a.m. of the following day. During this time, Powell only lost sight of defendant when he went to the restroom or retrieved a pan of food. She testified that there were about 100 to 150 people at the barbecue, and she had about six wine coolers starting in the afternoon. Powell also testified extensively as to the type and amount of meat grilled for the party, such as 80 pounds of chicken wings, 40 pounds of chicken quarters, etc. She confirmed that she learned that defendant had been arrested at least two years prior to trial and during that time, she never contacted the police to give information as to defendant's whereabout on that day. At some point, she was contacted by Franks and she gave him this information. She acknowledged that on August 31, 2011, as well as March 17, 2015, an investigator with the State came to her house and she refused to speak to him. On cross-examination, she mentioned her boyfriend, Brady, was good friends with defendant and had been friends with him longer than she had. The State then asked if Brady was at the party that day, and she said that he was.

¶ 48    Patrice Loston testified that she had known defendant for about 20 years. She was present at Powell's barbecue on June 21, 2008. She testified that Powell, her children, Brady, and defendant were present when she arrived around 9 a.m. and defendant left around 2 a.m. He was

responsible for the barbecue itself. She did not lose sight of defendant throughout the day except when one of them went to the restroom. She testified that she did not speak to the police about this information after she learned that defendant had been arrested. She spoke with defendant's prior counsel, Franks, when he called her, but she refused to speak to an investigator on March 24, 2015.

¶ 49    The parties stipulated that William Dorsch, a private investigator hired by defendant, would testify that he met with Seats on February 5, 2015 at the Iowa State Penitentiary. He discussed with Seats this shooting, and a written statement from Seats was prepared at the end of the meeting, which was entered into evidence. The defense rested.

¶ 50    In rebuttal, the State called Det. Deenihan. He testified that in the fall of 2013, he was assigned to investigate Seats' letter to the Cook County Sheriff's Office. He and Chicago police detective Anthony Padilla drove to Iowa to interview Seats. According to Det. Deenihan, during the interview, Seats "attempt[ed] to take the blame" for shooting Lightfoot. Det. Deenihan informed Seats that he had read the reports related to the shooting and, based on what he read, he found it "extremely unlikely" that Lightfoot had lied about who shot him. He encouraged Seats to tell the truth. At this point, Seats began crying and said that "he really didn't do it" but that he was trying to help defendant. He then admitted to Det. Deenihan that he was a witness to the shooting. Det. Deenihan denied that he ever informed Seats that the shooter had already been convicted, that people would lose their jobs if he came forward now saying that he was the actual shooter, or that Seats' statement would negatively affect his appeal in Iowa. However, he did inform Seats that defendant had been arrested and charged in connection with the shooting.

¶ 51    On December 11, 2013, Det. Deenihan, along with Chicago police sergeant Rick Lombard and ASA Molesky, went to Iowa to speak with Seats again. At this time, Seats again stated that he

was a witness to the shooting. Det. Deenihan testified that ASA Molesky spoke with Seats alone and, during that time, Seats provided ASA Molesky a signed statement regarding the shooting.

¶ 52    Det. Deenihan further testified that in both conversations with Seats, he mentioned Head, who had suggested to Seats that he contact police and confess that he was the actual shooter. Det. Deenihan learned that Head was named Eric Pratt and he identified a photo of Pratt. Det. Deenihan stated that he saw Pratt enter the courtroom during the trial that day.

¶ 53    ASA Molesky also testified consistently with Det. Deenihan's testimony. She further testified that she typed up Seats' oral statement into a written statement, which she printed, reviewed with him, and had him sign. She also informed Seats at that time that his conversation with her had no bearing on his current appeal in Iowa. Finally, she testified that at no point did Seats state that he was, in fact, the actual shooter.

¶ 54    Finally, the State called Spieker, Seats' mother, as a witness. She testified that she did not recall any conversation with Seats regarding him taking the blame for the shooting of Lightfoot. She acknowledged that she spoke with Det. Deenihan in January 2014. She admitted that she assisted Seats in getting him in touch with Head, although she stated that Head never answered the phone when she attempted a three-way phone call with him and Seats. The parties later stipulated that during their January 4, 2014 conversation, Spieker told Det. Deenihan that, in the fall of 2013, Seats told her that he was going to attempt to take the blame for the shooting.

¶ 55    The State rested, and the parties presented their closing arguments.

¶ 56    On September 23, 2015, the trial court found defendant guilty on all counts, including attempted first degree murder and being an armed habitual criminal. In doing so, the court stated that it found both Lightfoot and Craig to be credible; the inconsistencies between Lightfoot's testimony and Craig's testimony were minor; Seats' testimony was not credible because he

changed his story multiple times and his testimony had many inconsistencies; there were many inconsistencies between Powell and Loston's testimonies; and their testimonies were unbelievable where they claimed that at a party with at least 100 people they never lost sight of defendant for longer than a few minutes.

¶ 57                                  D. Posttrial Proceedings

¶ 58    Defendant filed a motion to reconsider verdict or for a new trial. Later, he filed a supplemental motion. On July 17, 2018, a posttrial hearing was held on defendant's motions in which he argued, *inter alia*, that the trial court erred in denying his motion to dismiss and that the State failed to prove him guilty beyond a reasonable doubt.

¶ 59    At the hearing, Dorsch testified on behalf of defendant that he had multiple phone conversations with Craig. He first spoke with Craig on March 1, 2016, who told him that he was not, in fact, a witness to the shooting, and during a second phone conversation, Craig stated that he was unaware of any family relationship with Lightfoot. The court denied the posttrial motion.

¶ 60    On July 12, 2019, following a sentencing hearing, the trial court sentenced defendant to 90 years' imprisonment to be served at 85%. Defendant's motion to reduce sentence was denied.

¶ 61    This appeal followed.

¶ 62                                  II. ANALYSIS

¶ 63    Defendant asserts two claims on appeal. First, he argues that his conviction should be vacated because it violates the double jeopardy clause. To this point, he contends that he did not consent to a mistrial and the alleged "manifest necessity" was a product of the State's intentional conduct, which also constituted reversible error. Second, he argues that the evidence at his retrial was insufficient to prove him guilty beyond a reasonable doubt.

¶ 64                                    A. Double Jeopardy

¶ 65    We first address defendant's claim of a violation of the double jeopardy clause contained in both the United States and Illinois Constitutions. Specifically, defendant asserts the following in support of this claim. Prior to his first trial, Perry was tried and convicted of attempting to intimidate and bribe Lightfoot into signing a recantation affidavit at Franks' office. According to defendant, the State was aware of this information and was aware that Franks had been named in the intimidation and bribery investigation but was cleared of any involvement. At defendant's first trial, the State called Lightfoot knowing that Lightfoot had previously asserted that Franks had been involved in the intimidation and bribery. A mistrial was then declared. As such, defendant contends that the State intentionally or recklessly caused the mistrial. For this reason, defendant asserts constitutional error in subjecting him to a retrial and his conviction and sentence should be vacated.

¶ 66    Both the United States and Illinois Constitutions protect a criminal defendant from successive prosecutions for the same offense. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. We interpret and apply the two separate double jeopardy clauses in the same way. See *People v. Kimble*, 2019 IL 122830, ¶ 28 ("We interpret our state's double jeopardy provision identically to the federal provision."). The clause bars "retrial for the same offense after an acquittal, retrial after a conviction, and multiple punishments for the same offense." *Id.* "In a bench trial, jeopardy attaches when the first witness is sworn and the court begins to hear evidence." (Internal quotations and citations omitted.) *People v. Bellmyer*, 199 Ill. 2d 529, 538 (2002); see also *Serfass v. United States*, 420 U.S. 377, 388 (1975).

¶ 67    "[W]hen a mistrial has been declared, a retrial may proceed without offending double jeopardy principles if (1) the defendant consents or acquiesces to the mistrial or (2) there is a

manifest necessity for the mistrial." *Kimble*, 2019 IL 122830, ¶ 32; see also *People v. Kosobucki*, 2021 IL App (2d) 190476, ¶ 36 (retrial is permitted where the defendant moved for or consented to a mistrial). "Where a court declares a mistrial without the defendant's consent, the court necessarily deprives the defendant of his valued right to have a particular jury decide his fate." *People v. Edwards*, 388 Ill. App. 3d 615, 623 (2009). Consent need not be express; implicit consent through acquiescence may also preclude a later double jeopardy claim. See *People v. Shoevlin*, 2019 IL App (3d) 170258, ¶ 19.

¶ 68 However, a trial judge may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. 579 (1824); see also *People v. De Frates*, 395 Ill. 439, 446 (1946). The United States Supreme Court has defined "manifest" necessity as a "high degree" of necessity. (Internal quotations omitted.) *Kosobucki*, 2021 IL App (2d) 190476, ¶ 37 (citing *Arizona v. Washington*, 434 U.S. 497, 505-06 (1978)). Whether a manifest necessity warranted a mistrial depends on the particular facts of a case. *People v. Street*, 316 Ill. App. 3d 205, 211 (2000).

¶ 69 We review a trial court's decision to declare a mistrial for abuse of discretion. *Kosobucki*, 2021 IL App (2d) 190476, ¶ 37 (citing *Edwards*, 388 Ill. App. 3d at 625); see also *Washington*, 434 U.S. at 514. This is so because "[t]he trial judge is in a far better position than an appellate panel to discern and decide the intentions of the prosecutors." *People v. Bennett*, 2013 IL App (1st) 121168, ¶ 17. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 70    There is no dispute in this case that the mistrial was declared by the trial court and further, by the time of the court's declaration, jeopardy had already attached. Thus, we proceed to consider defendant's claim that retrial was precluded. See *Martinez v. Illinois*, 572 U.S. 833, 841 (2014) (stating that the conclusion that jeopardy attached is just the beginning, rather than the end, of the inquiry as to whether the double jeopardy clause bars retrial).

¶ 71    Defendant first asserts that he neither consented nor acquiesced to the mistrial as he did not request the mistrial, he was not given adequate opportunity to object prior to the trial judge's recusal, and he immediately objected to the mistrial at the first opportunity. In response, the State argues that defense counsel had more than adequate opportunity to object to the mistrial but failed to do so and therefore, defendant implicitly consented. We agree with the State.

¶ 72    A failure to object to the declaration of a mistrial and the defendant's conduct thereafter can constitute implicit consent or acquiescence. *Kosobucki*, 2021 IL App (2d) 190476, ¶ 53; see also *People v. Camden*, 115 Ill. 2d 369, 378-79 (1987). However, the failure to object only evinces acquiescence if the defendant had an opportunity to object before the court's recusal. See *Kosobucki*, 2021 IL App (2d) 190476, ¶ 56; *People v. Dahlberg*, 355 Ill. App. 3d 308, 313 (2005).

¶ 73    The record does not support defendant's assertion that he lacked an opportunity to object before the court declared a mistrial. On the contrary, not only did defendant have multiple opportunities to object, but defendant, in fact, acquiesced to the mistrial.

¶ 74    A review of the record shows that the trial court suspended the trial proceedings over the course of several days, from Thursday to Monday, to consider whether a mistrial was necessary. "While the fact that the court contemplates a second trial is not conclusive [citation], we believe it is a factor to be considered in determining whether the defendant consented." *Camden*, 115 Ill. 2d at 378. Here, at the conclusion of the conference with the parties on the third day of trial, the court

expressed that it was considering whether a mistrial was necessary. Franks could have objected at that point; he did not do so. Additionally, the court insinuated that Franks himself appeared to be requesting a mistrial when the court stated: "I think [Franks] was referring to a possible mistrial earlier[.]" Franks offered nothing to refute the court's perception. This certainly appears to be, at the very least, implied consent or acquiescence, if not an affirmative request or consent to a mistrial.

¶ 75    Additionally, Franks' conduct after the mistrial ruling evinces acquiescence to the mistrial. The record shows that immediately after the court declared a mistrial, Franks did not object but instead responded, "Wonderful[.]" A week then passed before counsel voiced an objection to the mistrial and filed a motion asserting the same. Defendant argues that he objected on the next court date; however, there was no reason why a motion could not have been filed sooner. We simply cannot agree that defendant immediately objected to the mistrial, that he did not have adequate opportunity to object, and that he did not acquiesce to the mistrial.

¶ 76    We find *People v. Kosobucki*, 2021 IL App (2d) 190476, which defendant cites for support, distinguishable. There, this court determined that the defendant did not have an opportunity to object before the mistrial was declared. *Id.* at ¶ 60. However, the record in that case showed that, at a sidebar, after the State indicated that it would agree to a mistrial, defense counsel interjected and requested an opportunity to speak, which the court denied. *Id.* ¶ 54. The court then immediately declared a mistrial before the jury. After the jurors left, the court spoke with the parties about setting a date for retrial. *Id.* ¶¶ 54-55. During this conversation, defense counsel asserted the defendant's objection to the mistrial and noted that the court did not allow for argument on the mistrial. *Id.* ¶ 55. The facts in Kosobucki are markedly different from the circumstances before us.

Here, defense counsel had multiple opportunities to object either orally or in writing prior to the court's declaration and at no point did the court silence counsel.

¶ 77     We find that defendant failed to object to the mistrial, despite having more than adequate opportunity to do so, and his course of conduct just prior, during, and immediately after the court's declaration evinced acquiescence to the mistrial.

¶ 78     Nonetheless, defendant asserts that any acquiescence is "irrelevant as it was the State's actions that provoked the mistrial." Defendant cites to *People v. Roche*, 258 Ill. App. 3d 194, 199 (1994), for the proposition that a defendant's acquiescence in a mistrial "will generally remove any bar to reprosecution unless the conduct of the judge or prosecutor was calculated to provoke the defendant to move for a mistrial."[2] This "narrow exception" to the rule that the double jeopardy clause is not a bar to retrial where the defendant moves for the mistrial was announced by the United States Supreme Court in *Oregon v. Kennedy*, 456 U.S. 667, 673 (1982). See also *People ex rel. Roberts v. Orenic*, 88 Ill. 2d 502, 510-511 (stating that retrial of the defendant is not prevented "unless it can be said that the circumstances which brought about the defendant's motion for a mistrial were attributable to prosecutorial or judicial overreaching, or bad faith"). The Supreme Court further explained that "[p]rosecutorial conduct that might be viewed as harassment or overreaching *** does not bar retrial absent *intent* on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." (Emphasis added.) *Oregon*, 456 U.S. at 676.

---

[2] We note that none of the cases to which defendant cited applying this proposition ultimately found that, notwithstanding the defendant's consent or request, the mistrial was the result of prosecutorial or judicial provocation. Rather, they all conclude that the defendant was not intentionally goaded into requesting or consenting to a mistrial. See *People v. Hawks*, 386 Ill. App. 3d 844 (2008); *People v. Wilson*, 309 Ill. App. 3d 235 (1999); *People v. Gustafson*, 194 Ill. App. 3d 910 (1990); *Orange v. Kennedy*, 456 U.S. 667 (1982).

¶ 79    Defendant argues that the State knew of Lightfoot's allegations implicating counsel long before the trial began as evidenced by the 2011 bond hearing and the 2010 conviction of Perry in connection with those allegations. Despite defendant's attempt to characterize the circumstances at trial in his favor, the record belies this characterization. During the conference on the third day of trial, the State clearly alluded to the earlier allegations discussed at the bond hearing in order to provide context for the *new* allegations. According to the State, Lightfoot informed the State *that morning* that he had received multiple phone calls of the same nature the night before the third day of trial. These allegations once again implicated Franks and created a new situation that affected the trial proceedings, but we disagree with defendant's assertion that this was "the State's creation of a mid-trial difficulty." The complication was clearly out of the State's control, and thus, we disagree that the prosecution "goaded" defendant into requesting or consenting to a mistrial. See *Orange*, 456 U.S. at 679 (holding that the defendant must show that the governmental conduct was "intended to 'goad' the defendant into moving for a mistrial"); see also *People v. Parker*, 202 Ill. App. 3d 454, 465 (1990) (finding that the judge's conduct was not intended to goad the defendant into moving for a mistrial).

¶ 80    Further, any suggestion that the prior allegations and the testimony elicited from Lightfoot prior to the mistrial regarding those allegations constituted prosecutorial misconduct or bad faith is without merit as well. First, it was defense counsel's own question that led Lightfoot to mention the previous allegations. Second, the prior allegations were common knowledge to defense counsel and the State as both parties were present at the 2011 bond hearing where they were discussed and Franks himself addressed the allegations at the hearing on defendant's motion to reconsider the termination of bond. It cannot be said then that the State improperly used known prior allegations to provoke a mistrial.

¶ 81    Because we have determined that defendant impliedly consented to the mistrial and the State did not provoke the mistrial, we need not consider whether manifest necessity existed for the mistrial. Accordingly, double jeopardy did not bar defendant's retrial after the mistrial.

¶ 82                          B. Sufficiency of the Evidence

¶ 83    Next, defendant challenges the sufficiency of the evidence. He contends that the evidence even considered in the light most favorable to the State, was unsatisfactory where: (1) defendant had an alibi; (2) there was no forensic evidence tying defendant to the shooting; (3) Craig came forward as a witness only after requested by Lightfoot; (4) the inconsistencies between Craig and Lightfoot's testimonies rendered them improbable; and (5) Seats testified that he was the actual shooter. We note that defendant does not specify which offense, attempted first degree murder or armed habitual criminal, lacked sufficient evidence. As such, we presume he is challenging his conviction for both offenses.

¶ 84    When a defendant challenges the sufficiency of the evidence against him, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins,* 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 85    The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. A person commits the offense of being an armed habitual criminal if he "receives, sells, possesses, or transfers any firearm" after having been convicted of at least two prior triggering offenses. 720 ILCS 5/24-1.7 (West 2008). "The offense of attempted murder is shown when the State proves, beyond a reasonable doubt, that the defendant, with specific intent to kill commits *any act* which constitutes a substantial step toward the commission of murder." (Emphasis in original.) *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004); see also 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008).

¶ 86    There is no dispute that the individual who shot Lightfoot possessed a gun and had the intent to kill. Additionally, there is no dispute that defendant had two prior convictions that satisfied the requirements for the offense of being an armed habitual criminal. Further, defendant does not contest the reliability or admissibility of the identifications. Rather, defendant claims that the version of events which he presented at the bench trial, *i.e.* that Seats was the shooter and defendant was at Powell's house the entire day of the shooting, should have been found to be more credible than the State's version. Specifically, defendant contends that: (1) Craig's testimony was not credible, (2) Craig and Lightfoot's testimonies were improbable because of the discrepancies between their narratives, (3) defendant's alibi witnesses, who were credible, proved that he could not have been the shooter, and (4) Seats offered credible testimony that he was the actual shooter.

¶ 87    We observe that the majority of defendant's challenges to the evidence constitute a general attack on the result of the credibility contest between the opposing witnesses. We reiterate that "the determination of the weight to be given to witnesses' testimony, their credibility, and the reasonable inferences to be drawn therefrom from the evidence" are well within the purview of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). The trier of fact may accept or reject all

or part of a witness's testimony. *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004). Further, it is well established that "[t]he testimony of a single witness, if it is positive and the witness is credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Finally, "[a] reviewing court will not reverse a conviction simply because the evidence is contradictory [citations] or because the defendant claims that a witness was not credible. [citations]." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Nonetheless, we review the evidence presented and briefly address defendant's arguments in turn.

¶ 88    After reviewing the record, we conclude that the State presented sufficient evidence of defendant's guilt beyond a reasonable doubt. The victim of the shooting, Lightfoot, testified at trial that defendant was the individual who shot him. Additionally, Lightfoot identified defendant, or T-Dog, as the shooter to Officer Davis just minutes after the shooting. On the same day, at the hospital, he again asserted to Det. Gorman that defendant shot him and later picked him out of a photo array and a physical lineup. Defendant's multiple and unequivocal identifications of defendant were substantiated by the testimony of both Officer Davis and Det. Gorman, and his initial description of the shooter matched defendant's appearance at the physical lineup. Clearly, Lightfoot provided significant testimony pointing to defendant where Lightfoot made quite nearly an extemporaneous identification of defendant moments after he was shot eight times and has maintained since that day that defendant was the shooter.

¶ 89    Moreover, Lightfoot's narrative was largely corroborated by Craig's testimony. Craig's testimony as to the events that unfolded on June 21, 2008, was substantially similar to Lightfoot's. He observed a man in a brown hooded sweatshirt walk up to the group of people standing near 44th and Greenwood, aimed a gun at Lightfoot, and shot him several times. Craig saw Lightfoot run away and fall down and then the man walked over and shot Lightfoot several more times.

Craig identified that individual as defendant on multiple occasions. Given the consistencies between Lightfoot's and Craig's testimony, the trial court could reasonably find Craig to be a credible witness.

¶ 90    We reject defendant's assertion that Craig's credibility was diminished because he waited almost a year to make a statement to the police. The elapse of time was not so unusual as to warrant discrediting Craig's testimony. Craig and Lightfoot both testified that they spoke at the funeral and Lightfoot learned that Craig was a witness to the shooting. It was not until after defendant was located and arrested that Craig was contacted by Lightfoot and the police. However, Craig testified that he did not come forward with his information because he believed one of Lightfoot's closer friends who were there would have spoken with the police. We find the explanation reasonable and decline to speculate concerning the myriad possible reasons a witness might not elect to come forward on their own volition.

¶ 91    Additionally, defendant asserts that Craig only came forward after Lightfoot requested that he do so, a claim that Lightfoot denied this during his testimony. He stated that he believed the police already had Craig's name as a potential witness. Even if Lightfoot had made such a request, it did not necessarily affect Craig's credibility. It seems to us reasonable for a victim to ask a witness to assist in providing information necessary to charge the perceived perpetrator with the crime. Ultimately, we do not find defendant's several challenges to render the testimonies of either Lightfoot or Craig improbable or incredible.

¶ 92    Defendant also points out a number of discrepancies between Lightfoot and Craig's testimonies, namely (1) Lightfoot testified that he did not see Craig in the area on the day of the shooting; (2) Craig's description of the number of people in the area differed from Lightfoot's recitation; (3) Craig testified that the shooter's hood was up immediately prior to the shooting

whereas Lightfoot testified that the shooter's hood was down before he was within a few feet of Lightfoot; and (4) Craig's testimony that he was within a few feet of Lightfoot when the shooting occurred is contradicted by Lightfoot's testimony that he never saw Craig that day. "Minor inconsistencies in the testimony between witnesses or within one witness's testimony may affect the weight of the evidence but do not automatically create a reasonable doubt of guilt." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85 (citing *People v. Adams*, 109 Ill. 2d 102, 115 (1985)). Further, the trier of fact determines how flaws or discrepancies in witness testimony affect that evidence's weight. *Id.* In this case, those discrepancies are not so significant as to eliminate all credibility of Lightfoot and Craig. The trial court also came to the same conclusion, noting in finding defendant guilty the "minor inconsistencies" between their testimony. Thus, we reject defendant's assertion that Lightfoot and Craig's eyewitness testimony did not constitute sufficient evidence to support the convictions. See *People v. Cunningham*, 212 Ill. 2d 274, 284 (2004) (finding that nothing in the record demonstrated that the entirety of the witnesses' testimony as unworthy of belief).

¶ 93    Defendant also asserts that he had a strong alibi defense and his witnesses' testimonies were consistent. At trial, Powell and Loston testified that defendant was a at barbecue hosted by Powell for 22 hours on June 21, 2008 and that he was never out of their sight for more than five minutes during the entire day. Although defendant presented testimony that he could not have been the shooter because he was at Powell's house the entire day, "the weight to be given alibi evidence is a question of credibility for the trier of fact, and there is no obligation on the trier of fact to accept the alibi testimony over positive identification of an accused." *Corral*, 2019 IL App (1st) 171501, ¶ 90 (citing *People v. Slim*, 127 Ill. 2d 302 (1989)).

¶ 94    Here, the record contradicts defendant's assertion that the testimony of his alibi witnesses was consistent. Upon finding defendant guilty, the court stated that it found Powell and Loston's testimony to be unbelievable, noting the following inconsistencies in their statement: (1) Loston testified that the enclosed porch that faced the backyard was off the kitchen, whereas Powell testified that her bedroom is between the kitchen and the porch; (2) Loston testified that Powell's boyfriend, Brady, was at Powell's house when she arrived, but Powell did not mention Brady's presence until cross-examination despite being asked who was at her house at various times; and (3) Loston testified that there was a DJ at the party and that the police came by several times and spoke with Powell, but Powell did not mention either the DJ or the police. The trial record supports these findings. Moreover, the court also stated that the suggestion that they never lost sight of defendant the entire day at a party with over 100 people was incredible. The court further took issue with the fact that both Powell and Loston refused to talk to the State's investigator, even though they allegedly knew defendant to be innocent of the crime with which he was charged. As we have made clear, we will not question the trial court's determination of credibility or substitute our judgment for that of the trial court. Thus, viewing the evidence in the light most favorable to the State, we cannot say that it was unreasonable for the trial court to find that the alibi testimony was improbable.

¶ 95    Next, defendant asserts that the trial court should have found that his guilt was not proven beyond a reasonable doubt because Seats testified that he was the actual shooter. Although we will not make our own credibility determination on appeal, it is readily apparent from a review of the trial record that it was rational for the trial court to find Lightfoot and Craig's testimony to be more credible than Seats'. Seats changed his narrative multiple times. He asserted his shooter narrative in the letter, to defendant's investigator, and at trial. However, he asserted his witness narrative to

Det. Deenihan and ASA Molesky and signed a corresponding statement. There were also other issues with Seats' testimony, where he first claimed Head did not exist but later admitted that he had met Head once or twice and his initial letter to the police incorrectly identified the location of the shooting. Moreover, the potential gang involvement in Seats' decision to confess as the shooter, as well as his stated desire to serve his prison sentence in Illinois rather than Iowa, compromised his credibility. As such, defendant's argument that Seats was a credible witness is firmly rebutted by the record.

¶ 96     Finally, we outright reject defendant's assertion that the lack of physical evidence created a reasonable doubt as to his guilt. It is well settled that physical evidence is unnecessary to corroborate an eyewitness account. *Corral*, 2019 IL App (1st) 171501, ¶ 91; see also *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23 ("Because the trial court found [the witness's] identification and testimony to be credible, the lack of physical evidence had no bearing on [the defendant's] conviction.").

¶ 97     Therefore, viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could find that defendant committed the offenses beyond a reasonable doubt and defendant's challenge to the sufficiency of the evidence is meritless.

¶ 98                              III. CONCLUSION

¶ 99     For the reasons stated, we affirm the judgment of the circuit court.

¶ 100   Affirmed.